WISDOM, Circuit Judge:
In this appeal from an order of the Bankruptcy Court, Erbon W. Wise, a claimant in the bankruptcy proceedings of Stalvey & Associates, asks this Court to determine whether his claim against the debtor is protected as a “customer’s claim” under the Securities Investor Protection Act of 1970 (SIPA), 15 U.S.C. §§ 78aaa-78ll (1982). Wise seeks recovery for the value of his bonds, which the debtor, a broker-dealer, removed from the safe-keeping of a bank that held the bonds as collateral for a loan to Wise. The trustee in bankruptcy denied Wise’s claim on the grounds that he was not a customer under SIPA’s relevant provision. Id. § 78lll(2). The bankruptcy court reversed the trustee. The trustee and the Securities Investor Protection Corporation (“SIPC”) appealed to this court. We agree with the trustee and SIPC that Wise was not a customer within the meaning of SIPA, and accordingly reverse.
I. FACTS AND PROCEEDINGS BELOW
Erbon Wise, a retired general living in Sulfur, Louisiana, for over 20 years had invested in municipal bonds and revenue bonds. He bought his bonds from Sam Stalvey both before and after Stalvey organized his own company. Wise sought letters of credit from The Mississippi Bank of Jackson, Mississippi (“Bank”), for a venture unrelated to this proceeding. The Bank required that he deposit $500,000 worth of collateral bonds in their safekeeping department to secure these letters of credit. Wise delivered half of the bonds to the Bank personally, and sent the other half to Sam Stalvey, president of Stalvey & Associates, Inc. (“Debtor”), to be delivered to the Bank as collateral. Wise received the safekeeping receipts for these bonds. Under the terms of the agreement for the letter of credit and for safekeeping, no one could remove the bonds from the bank without a safekeeping receipt and without substituting replacement bonds having an equal value.
*467 The Bank informed Wise that it was reluctant to assume the responsibility of clipping the bonds’ coupons that would mature and could be cashed at various times. Wise, however, wished to avoid travelling extensively between his residence in Sulfur, Louisiana, and Jackson, Mississippi, to clip coupons. He therefore gave Stalvey authority to clip and cash these coupons and then deposit the proceeds to Wise’s account with the Debtor.[1] Stalvey or one of his employees, usually Marcia Crisler, routinely clipped and cashed coupons for Wise as a free service to a “preferred customer”. The Debtor also absorbed the Bank’s safekeeping charges for Wise. On four occasions, however, Wise sent the safekeeping receipts for particular bonds to Stalvey with instructions to remove these bonds from the bank, replace them with other named bonds of equivalent value, and sell the former collateral.
On February 18, 1982, the Bank notified Wise that it had only one $5,000 bond in its safe-keeping account. The parties have stipulated that either Stalvey or his employee, Marcia Crisler, removed the missing bonds from the Bank. This removal of the bonds took place without Wise’s instructions, was not accompanied by safekeeping receipts, and was contrary to the agreement between Wise and the Bank. No one has contended that the removal of the bonds was within the Stalvey’s ordinary course of business as a broker. Wise still holds the safekeeping receipts for the missing bonds, but the bonds’ whereabouts are unknown.
On the same day the Bank notified Wise that the bonds were missing, the Securities Investor Protection Corporation (“SIPC”) obtained an order in the United States District Court for the Southern District of Mississippi appointing a trustee for the liquidation of the Debtor and transferring the cause to the Bankruptcy Court. On March 31,1982, Wise agreed with the Bank that he would first seek recovery from SIPC as a “customer” of the Debtor, but did not surrender any claims against the Bank. Wise filed his claim against SIPC on April 15, 1982.[2] Under SIPA, if Wise were a “customer” of the Debtor, his claim would be insured by SIPC, just as the depositor of a failed bank receives protection from the FDIC.
On March 2, 1983, the trustee denied Wise’s claim for the bonds on the grounds that they were not covered under SIPA. Wise appealed to the bankruptcy court, and there prevailed. The trustee and SIPC appealed.
II, DISCUSSION
On appeal, SIPC and the trustee advance two contentions. First, they argue that the Bankruptcy Court’s determination that Wise was a “customer” under SIPA is a conclusion of law rather than a finding of fact, and therefore is not entitled to the deference appellate courts pay to the clearly erroneous standard of review. Second, the appellants argue that Wise is not a “customer” within the meaning of 15 U.S.C. § 78lll (2) (1982) because Stalvey did not “receive, acquire, or hold” the securities “in the ordinary course of business” *468 and because Stalvey neither had the securities “for safekeeping” nor had them “with a view to sale”. See id.

A. The Standard of Review

Wise has argued that the Bankruptcy Court’s determination that Wise was a customer within the ambit of SIPA is a finding of fact that cannot be set aside absent an express finding that it was clearly erroneous. In re McCrary’s Farm Supply, 8 Cir.1982, 705 F.2d 330, on which the claimant principally relies, fails to carry this burden. In McCrary’s, the bankruptcy court determined that a certain business outlet fell within the scope of the U.C.C.’s “place of business”. On appeal, the Eighth Circuit held that this finding was a factual issue that would not be set aside unless it was clearly erroneous. Id. at 332. That court, however, carefully limited its holding: “[T]his determination does not involve a conclusion based on an application of a legal standard, but rather involves a finding based on a non-technical statutory standard closely related to practical human experience.” Id. The “non-technical statutory standard” is nowhere defined in the U.C.C. Id.
“Customer”, by contrast, is a statutorily defined term of art as used in SIPA. The term is an integral part of a comprehensive statutory scheme governing the rights of creditors and brokers.[3] It is not used in the colloquial sense of “one who buys or trades”. It is instead meant as a shorthand designation for those eligible under SIPA to receive special protection for their investments.
This Court has held that interpretations of such statutorily defined terms are a matter of law. In Donovan v. American Airlines, 5 Cir.1982, 686 F.2d 267, 270 n. 4, the Court (Rubin, J.) stated that in deciding whether student-trainees are “employees” under Fair Labor Standard Act’s statutory definitions, “[t]he standard of review ... is that of a legal, and not a factual, determination”. Some courts have explicitly held that the determination of a claimant’s status as a “customer” under the SIPA “presents solely a question of law”. SEC v. White & Co., E.D.Mo.1975, 406 F.Supp. 806, 807, aff'd, 8 Cir.1976, 546 F.2d 789. In SEC v. Albert & Maguire Securities Co., 3 Cir.1977, 560 F.2d 569, 571, the court observed that the stipulation that parties were “customers” under SIPA “purports to decide a legal issue”. This Court therefore must “independently determine the correctness of the ultimate legal conclusion adopted by the bankruptcy judge on the basis of the facts found”. In re Hammons, 5 Cir.1980, 614 F.2d 399, 403.

B. Wise’s Status as Customer

Congress established SIPC in 1970 as a nonprofit membership corporation to protect customers who had deposited cash or securities with failing broker-dealers. SIPC was also to arrest the disastrous “domino effect” that threatened otherwise solvent brokers having substantial open transactions with firms that failed, to restore investor confidence in the capital markets, and to upgrade the financial responsibility requirements for registered brokers and dealers. See SIPC v. Barbour, 1975, 421 U.S. 412, 415, 95 S.Ct. 1733, 1736, 44 L.Ed.2d 263, 267. SIPC maintains a fund for customer protection by laying assessments on the annual gross revenues of all securities dealers registered under the 1934 Securities Act. 15 U.S.C. §§ 78ccc(a)(2)(A), 78ddd(c)(2) (1982). SIPC makes payments to customers who have outstanding obligations with the failed broker or dealer up to $500,000. Id. § 78fff-3(a).

*469
1. The Trustee’s Denial of Wise’s Claim

The trustee in bankruptcy denied Wise’s claim for the missing bonds. Although we reach the same result, we use a different route from the one the trustee used.
The trustee relied on two cases in denying Wise’s claim: SEC v. Packer, Wilbur & Co., 2 Cir.1974, 498 F.2d 978, and SEC v. Kenneth Bove & Co., S.D.N.Y.1974, 378 F.Supp. 697. In Packer Wilbur, a securities house irresponsibly, if perhaps unknowingly, aided an investor’s fraudulent scheme to buy and sell stock in violation of the SEC’s margin requirements. Packer Wilbur, a brokerage house on the verge of failure, was a third party in one of the transactions in this scheme. Packer Wilbur surmised the investor’s purpose, and paid for the investor’s stock with two checks that it would later dishonor. Packer Wilbur then sold the stock to a third person, and applied the proceeds to its own account. Packer Wilbur fell upon hard times in 1971, and in June of that year SIPC appointed a trustee. The securities house was left with two valueless checks, and it sought recovery both from Packer Wilbur and the investors. In denying the claim, the Court of Appeals for the Second Circuit held:
“SIPA was not designed to provide full protection to all victims of a brokerage collapse. Its purpose was to extend relief to certain classes of customer[s].”
Packer Wilbur, 498 F.2d at 983. The trustee in the instant case relied on that language in denying Wise’s claim.
In Packer Wilbur, however, the question presented was whether a commercial broker could receive the same protection afforded to “members of the investing public”. Id. at 984. The court’s holding is inapplicable to Wise’s case, where a “member[] of the investing public” has filed a claim from a loss he suffered as a direct result of his dealings with a failed broker-dealer.
The trustee’s second case, SEC v. Kenneth Bove & Co., S.D.N.Y.1974, 378 F.Supp. 697, is also inapposite. In Kenneth Bove, the claimants agreed to sell to the debtor, Kenneth Bove & Co., 7800 shares of Princeton Associates for Human Resources common stock for $23,302.50. The claimants were not customers of the debtor before the instant transaction, and they failed to deliver the stock to the debt- or on the sale date or before the brokerage house went into liquidation two weeks later. The district court held that because the stock was never delivered to the liquidated brokerage firm, the claimants were not customers within the meaning of SIPA:
“To have a protected ‘net equity’ claim under the Act as a ‘customer’, the claimant must have entrusted his securities to the debtor in liquidation. Claimants’ shares were never actually received by the debtor; the Debtor never came into their possession or control so as to become accountable under the Act to the claimants therefor.”
Kenneth Bove, 378 F.Supp. at 699 (emphasis in original).
In Kenneth Bove, the broker did not have even physical possession or access to the securities. The determination that he did not fall within the statute was properly predicated on the bright-line rule that in “the absence of actual receipt, acquisition or possession of the property of a claimant by the brokerage firm under liquidation”, a claimant was not entitled to the protection of SIPA. In the instant case, the Debtor, through Stalvey or Crisler, had at least access to the bonds for the purposes of clipping coupons and physical possession of the bonds, for they were able to remove the bonds from the Bank’s safekeeping department, subject to the condition that they be replaced by bonds of equivalent value. Wise’s appeal therefore falls on the other side of this bright-line rule, and we cannot reject his claim solely on the basis of Kenneth Bove.

2. The Bankruptcy Court’s Reversal of the Trustee

The bankruptcy court rejected the trustee’s analysis. The court held instead that Stalvey “held the securities for safekeeping” for Wise, thus bringing his claim *470 within section 78lll (2). The court seems to have relied upon the designation on Wise’s receipt:
“While the Bank had actual possession of the securities, the securities were held in a safekeeping account styled ‘Stalvey & Associates, Inc. for Erbon W. Wise.”
Both parties conceded on appeal that the bank’s styling of the bonds in Stalvey’s name is inexplicable — given the circumstances in which the account was opened. It is probably attributable to clerical error. In any case, the designation constitutes a tenuous ground for holding that Stalvey “held” the securities for Wise, and, further, that Wise was a customer of Stalvey for the purposes of the missing bonds.
The bankruptcy judge also relied on the longstanding broker-customer relation between Stalvey and Wise, the broker’s access to the bonds both for clipping coupons and for sale, and the Bank’s “negligence”:
“In addition, Stalvey held the securities with a view to sale. He was authorized to act upon Wise’s instructions and had an obligation to make prudent investments.
“Clearly Stalvey had access to the bonds through presentation of the proper safekeeping receipt. Wise had no way of preventing Stalvey from removing the bonds from his account without a receipt and should not be made to suffer as a result of negligence on the part of the Bank. The Trustee has admitted that it was the duty of the Bank to insure that the bonds were not removed from its safekeeping without the proper receipt.
“The negligence of the Bank should not work to defeat the clear intentions of the parties that Stalvey be allowed access to the bonds for the purpose of acting as brokering agent for Wise. Customer must not be restricted to exclude investors who have suffered a substantial loss as a result of their broker’s activity.”

3. Our Analysis

To determine the reach of the SIPA’s protection, we must first examine the statute. “It is a universally recognized rule of statutory construction that a court should look first to the language of the statute to determine the legislative purpose.” SEC v. Ambassador Church, 6 Cir.1982, 679 F.2d 608, 611. The SIPA itself mentions “customer” in several places, but the parties agree that the only applicable provision is 15 U.S.C. § 78lll(2) (1982). The provision states in pertinent part:
“(2) Customer. — The term ‘customer’ of a debtor means any person (including any person with whom the debtor deals as principal or agent) who has a claim on account of securities received, acquired, or held by the debtor in the ordinary course of its business as a broker or dealer from or for the securities accounts of such person for safekeeping, with a view to sale, to cover consummated sales, pursuant to purchases, as collateral security, or for purposes of effecting transfer.”
A claimant therefore qualifies as a customer of a broker if the broker “received, acquired, or held” the claimant’s securities “in the ordinary course of business,” either with a “view to sale” or for “safe-keeping”.
Wise has argued once a customer, always a customer. He asserts that Stalvey’s clipping coupons from the collateral bonds, and Stalvey’s occasional replacement of those bonds with others of like value constituted an ordinary course of business. SIPA does not contest this characterization, and we agree that the clipping and cashing of coupons and the replacement of bonds represented an ordinary course of business. Wise also introduced into evidence records from the Debtor showing the long-standing dealings between Wise and the Debtor. But Wise then claims “[although Wise by no means consented to Stalvey’s removal and conversion of the securities, their theft does not diminish the fact that Stalvey’s access to the bonds was in the ordinary course of business”. Appellee’s brief at 20.
It is true that Wise and the Debtor had a broker-customer relationship that often brought Wise within the ambit of the *471 SIPA. Wise’s original complaint against the trustee contained prayers for relief to which Wise was clearly entitled as a “customer” under section 78lll(2). 15 U.S.C. § 78lll(2) (1982). Moreover, if Wise had instructed the Debtor to remove the pledged bonds from safekeeping for sale, Wise would have a claim under the SIPA for the value of those bonds if the Debtor had taken the bonds but then failed to execute the order or to remit the proceeds before going into receivership. Similarly, if the Debtor cashed coupons clipped from the bonds that Wise had pledged for safekeeping, but had failed to remit the money, Wise would have a cognizable claim under the SIPA.
The statute, however, designed relief predicated upon the specific securities or transactions for which a claim is made. Id. § 78fff(c). Wise’s customer status in the course of some dealings with a broker will not confer that status upon other dealings, no matter how intimately related, unless those other dealings also fall within the ambit of the statute. “The Act contemplates that a person may be a ‘customer’ with respect to some of his claims for cash or shares, but not with respect to others.” S.E.C. v. F.O. Baroff Co., 2 Cir.1974, 497 F.2d 280, 282 n.2. Customer status “in the air” is insufficient to confer the SIPA’s protection on a given transaction.
The statute’s first requirement is that the broker must have “received, acquired, or held” the securities. The Debt- or, however, “received, acquired, or held” nothing. Although the parties stipulated that the Debtor or one of the employees of the Debtor took the bonds, we cannot say that the Debtor possessed the securities within the meaning of the statute. The securities were pledged as collateral. Neither Wise nor Stalvey could legally sell this collateral, even with safekeeping receipts, unless Wise provided substitute collateral. Until that time, the bonds were encumbered by Wise’s pledge to the bank and were neither “held” nor “possessed” by Wise or Stalvey. Cf. S.E.C. v. F.O. Baroff Co., 2 Cir.1974, 497 F.2d 280, 284, holding that securities pledged as collateral are not within protection of the SIPA because of the “formidable barrier in the way of any ... sale or disposition”.
Section 78lll (2) further requires that for Wise to be a customer, Stalvey must hold the lost securities “with a view to sale”, in safekeeping, or as collateral. Wise fails to meet these criteria. Wise argued both in bankruptcy court and on appeal that Stalvey held the securities “with a view to sale”:
“The fact that Stalvey corresponded and communicated with Wise concerning potential sales including the bonds in The Mississippi Bank and that on at least four different occasions sales were consummated further evidences Stalvey & Associates’ ‘view to sale,’ and his holding securities ‘pursuant to purchases’ and ‘for the purposes of effecting transfer.’ ”
Appellee’s brief at 22.
Assuming for argument that the Debtor “held” the bonds, it cannot fairly be said that the securities were held with “a view to sale”. The missing bonds were intended as security for a letter of credit that the Bank had extended to Wise. It is probative, but not dispositive, that Wise replaced and sold the pledged bonds on four earlier occasions. But at the moment Wise encumbered certain bonds as collateral for the letter of credit, their primary purpose became security for the Bank. From that moment on, the securities were not held with a view to sale.
Nor did the Debtor hold the securities “in safekeeping” or “as collateral”. The bankruptcy judge concluded that the securities were held in “safekeeping” for Wise by Stalvey, apparently relying on the Bank’s designation: “Since the safekeeping account was in Stalvey’s name, Stalvey actually held the securities for safekeeping and [Wise] is therefore a customer under the Act.” The Bank’s designation of the account as “safekeeping”, however, has no importance to the statutory criteria under section 78lll (2). “Safekeeping” is a term of art having distinct meanings in both *472 investment and banking. In brokerage houses, “safekeeping” securities are those that are fully paid for and held in custody by the broker. See H.R.Rep. 1613, 91st Cong., 2d Sess. 2 (1970), reprinted in 1970 U.S.Code Cong. & Ad.News 5254, 5256. “Safekeeping” as designated on the bank’s receipts refers to securities pledged by an individual as collateral for loan with a bank. The designation of securities “for safekeeping” by the Bank therefore has no bearing on Wise’s status as a “customer” under the SIPA.
Similarly, Wise cannot rely on the use of the securities as “collateral” to bring him within the SIPA. The securities were collateral for a customer’s letter of credit at a commercial bank. No party has contended that this letter of credit was related to securities trading. The SIPA’s use of “collateral” was not intended to encompass such transactions. “Collateral”, as used in the statute, referred to securities left with the broker to cover the purchaser’s margin purchases. See id.; see also SEC v. F.O. Baroff, 2 Cir.1974, 497 F.2d 280, 284 (use of securities as “collateral for margin purchases ... of other securities” would have brought lost stocks within coverage of SIPA).
Judicial interpretations of “customer” status support a narrow interpretation of the SIPA’s provisions. On at least two occasions, the Second Circuit declined to extend the Act’s protection to parties that fell within the literal definition of customer. In F.O. Baroff Co., the court faced the issue of “whether a voluntary lender of securities to a failing brokerage house, who made his loan to help out the company and not for a purpose related to securities trading or investments, qualifies under the Act’s scheme”. 497 F.2d at 281. The court found that although the literal language of 15 U.S.C. § 78fff(c)(2)(A)(ii) seemed broad enough to cover the claimant, the Act’s legislative history showed that Congress intended that SIPA was to protect only “trading customers” and “public customers” of brokers. Id. at 282. A person who becomes a creditor of a broker in some manner that does not involve participation in the securities market is not covered.[4]
In SIPC v. Morgan, Kenney & Co., 2 Cir.1976, 533 F.2d 1314, cert. denied, 1976, 426 U.S. 936, 96 S.Ct. 2650, 49 L.Ed.2d 387, the Court held that the individual beneficiaries of a profit-sharing plan did not qualify as customers of a failed brokerage house that owed the plan money.[5] The Third Circuit has refused to extend the SIPA’s coverage to an assignee of a “customer’s” cause of action. S.E.C. v. Albert & Maguire Securities Co., 3 Cir.1977, 560 F.2d 569, 571-72. But cf. S.E.C. v. Ambassador Church, 6 Cir.1982, 679 F.2d 608, holding that a church issuing mortgage bonds was a “customer” of a broker-dealer that sold bonds without commission even though the dealer performed other services for the church resembling those of an underwriter.
The legislative history of SIPA bolsters our holding. SIPA was intended to protect customers who had entered the securities market but then suffered losses as a result of a broker’s failure. The claimant here, Wise, had removed the last securities from the market to pledge them as collateral for his letter of credit. The statutory scheme envisioned by the drafters of the statute was to protect persons buying and selling securities through a stockbroker, not to compensate a person who turned over his securities to a bank as collateral for a loan by that bank. See H.R.Rep. No. 1613, 91st Cong., 2d Sess. 1-3 (1970), re *473 printed in 1970 U.S.Code Cong. & Ad.News 5254, 5254-56.
Moreover, there is evidence in the legislative history that Congress believed that the SIPA was only an “interim step” that would not provide complete protection for losses occasioned by the failure of broker-dealer firms. Id. at 12, reprinted in 1970 U.S.Code Cong. & Ad.News at 5266. Courts have acknowledged the limited coverage of the SIPA regardless of the equities in favor of the claimant. In SIPC v. Executive Securities Corp., 2 Cir.1977, 556 F.2d 98, the court held that a loan agreement between an investor and his broker was not covered under SIPA. S.E.C. v. F.O. Baroff Co., 2 Cir.1974, 497 F.2d 280 (investor/creditor denied SIPA protection).
The legislative history also shows that Congress recognized the limited coverage of the specific language used in section 78lll (2). The House Report commented on analogous language in Section 8(b) of the Securities Exchange Act of 1934:
“[The provision applies] only ‘in the course of business as a broker,’ thus apparently excluding indebtedness not incurred in the ‘ordinary course of business’ and indebtedness incurred in the course of business as a dealer. Indebtedness in these categories presents a hazard to customers equal to that presented by indebtedness incurred ‘in the ordinary course of business as a broker.’ ”
Id. at 13, reprinted in 1970 U.S.Code Cong. & Ad.News 5267. Congress then enacted such a provision in section 78lll (2). Congress intended section 78lll (2) to have only limited coverage.
Wise is not a customer of Stalvey as far as the missing bonds are concerned. Stalvey did not hold the securities in the ordinary course of business. Moreover, even if Stalvey, in some tenuous sense, “had” the bonds, Stalvey did not have them with a “view to sale” or for safekeeping. The judgment of the bankruptcy court is therefore REVERSED.

. Initially the arrangement consisted of a one-sentence letter signed by Wise stating: “I hereby authorize Stalvey & Associates to clip and deposit above coupons to account number 60-2572-0.” After about three months, the Bank entered into a more formal agreement with Wise, where Wise appointed "Stalvey & Associates, Inc. to collect all income due on said securities" deposited with the Bank. That agreement specifically named Sam Stalvey and an employee, Marcia Crisler, as the authorized representatives of Stalvey & Associates who "shall have authority to perform any and all actions necessary to collect income, including having access to securities deposited with The Mississippi Bank”. Wise further agreed to “hold harmless and indemnify” the bank from "liability losses or damages” from "missing coupons” and "from the loss of any securities” placed "into the control of Stalvey & Associates, Inc. for the purposes set forth in this Agreement”.

. Count I of Wise’s complaint was for bonds that Wise had purchased but that the Debtor failed to deliver. Count II was for the bonds that had been in safekeeping at the Bank. Count III was for bonds that Wise had purchased from the Debtor without the knowledge that the bonds’ issuers had defaulted or were bankrupt.

. Congress has demonstrated its interest in the definition by amending its scope in the Securities Investor Protection Act Amendments of 1978. See Securities Investor Protection Act Amendments of 1978, Pub.L. 95-283 § 16, 92 Stat. 249, 271; Sen.Rep. No. 763, 95th Cong., 1st Sess. 16 (1978), reprinted in 1978 U.S.Code Cong. & Ad.News 764, 779. Moreover, the definition of “customer” is part of a comprehensive scheme regulating relations between debtors and creditors. The SIPA’s provision defining “customer” was amended to conform with changes made in Chapter 11 by the Bankruptcy Reform Act of 1978. See Bankruptcy Reform Act of 1978, Pub.L. 95-598 § 308(o), 92 Stat. 2549, 2676.

. The court reached the same conclusion in SIPC v. Executive Securities Corp., 2 Cir.1977, 556 F.2d 98, which involved a loan of securities to a brokerage house in return for cash collateral equal to the market value of the loaned shares.

. The trustees of the plan made all the decisions for investment; the individual beneficiaries of the plan had no dealings with the broker and the broker never actually held any property of the individual beneficiaries. 533 F.2d at 1315.