In re WADDELL JENMAR
SECURITIES, INC.,
Debtor.

SECURITIES INVESTOR PROTECTION
CORPORATION, Plaintiff,

v.

WADDELL JENMAR SECURITIES,
INC., Defendant.

Charles T. STEINMAN, Jr., Individually And as Trustee of The Salisbury Animal Hospital, P.A. Pension and Profit Sharing Plan Trust, FBO Charles T. Steinman, Jr., FBO John M. Strasser, FBO Miles A. Moody, FBO Bonnie H. Karriker, FBO Pamela H. Smith, And FBO Margaret M. Douglass, John M. Strasser, Miles A. Moody, Bonnie H. Karriker, Pamela H. Smith, Margaret M. Douglass, E. Earl Jenkins, Jr., Katherine B. Nuckolls, William E. and Ellyn R. Easterling, and Mabel P. Hatch, Plaintiffs,

v.

SECURITIES INVESTOR PROTECTION
CORPORATION, Defendant.

Bankruptcy No. 88–00534.
Adv. No. S–90–00277–AP.

United States Bankruptcy Court,
E.D. North Carolina.

May 10, 1991.

Joseph M. Lischwe, Maupin Taylor Ellis & Adams, P.A., Raleigh, N.C., for trustee.

Judith A. Powell, Kilpatrick & Cody, Atlanta, Ga., for claimants.

Kenneth J. Caputo, Protection Corp., Washington, D.C., for Securities Investor.

## MEMORANDUM OPINION

A. THOMAS SMALL, Bankruptcy Judge.

This is an adversary proceeding to determine the validity of claims against the debtor, Waddell Jenmar Securities, Inc. The trial was held on April 18, 19, 22 and 23, 1991, in Raleigh, North Carolina.

### JURISDICTION

On April 10, 1989, the United States District Court for the Middle District of North Carolina entered an order adjudicating that the customers of Waddell Jenmar Securities, Inc. ("Jenmar") were in need of the protections afforded by the Securities Investor Protection Act. 15 U.S.C. § 78aaa, *et seq.* The Securities Investor Protection Corporation was appointed trustee for the liquidation of Jenmar and the liquidation proceeding was removed to the U.S. Bankruptcy Court for the Middle District of North Carolina. This adversary proceeding to consider the objections to the trustee's determination of various claims was transferred to this court by an order dated December 4, 1990. This is a "core proceeding" which the court may hear and determine. 28 U.S.C. §§ 157(b)(2)(B) and (O).

## BACKGROUND FACTS [1]

Waddell Benefit Plans, Inc. ("WBP") was incorporated in the 1970's for the purpose of offering pension and profit sharing plan design, implementation and administration. In 1982, WBP became a registered investment advisor with the Securities and Exchange Commission and maintained that registration until 1986.

On March 24, 1983, Waddell Jenmar Securities, Inc.,[2] the debtor, was incorporated for the purpose of engaging in the business of buying, selling, brokering, and dealing in stocks, bonds, securities and other investments. On September 19, 1983, the debtor became a registered broker-dealer with the SEC and maintained that registration at all times relevant to this matter. Upon registering with the SEC as a broker-dealer, the debtor was required to be, and was, a member of SIPC.

Jenmar's powers as a registered broker-dealer were limited by virtue of its small net capital. Pursuant to 17 C.F.R. § 240.15c3–1, the debtor was not permitted to hold funds or securities for customers, was not allowed to owe money or securities to customers, and was not authorized to carry customer accounts. Because the debtor could not hold customer funds or customer securities, the debtor was required to clear all securities purchases and sales for its clients through a clearing broker. At the time the debtor sought registration as a broker-dealer, it was clearing transactions through Pershing & Co. On July 1, 1985, the debtor began clearing transactions through Prudential–Bache–Securities, Inc. On July 5, 1985, the debtor was granted authority by the SEC to engage in business as a registered investment advisor and maintained that registration at all times relevant to this matter. WBP terminated its registration as investment advisor effective May 31, 1986.

The president of both Jenmar and WBP was Guilford T. Waddell, III. From 1979 until September 19, 1983, Mr. Waddell was a registered securities principal and sales representative for Integrated Resources Equity Corporation, a registered broker-dealer firm. After September 19, 1983, for all times relevant to this proceeding, Mr. Waddell was a registered securities principal and sales representative for the debtor.

## ISSUES PRESENTED

All of the claimants contend that Mr. Waddell, acting through the debtor, Jenmar, stole their funds or securities and that their losses are insured by SIPC. SIPC readily acknowledges that the claimants were defrauded by Mr. Waddell, but maintains that the claimants were not Jenmar's "customers" as that term is defined in 15 U.S.C. § 78*lll* (2).

Congress passed SIPA in 1970 to protect the assets of investors held by broker-dealers who later become insolvent. *See In re Brentwood Securities, Inc.*, 925 F.2d 325, 326–27 (9th Cir.1991). SIPC, a nonprofit corporation made up of registered brokers and dealers, insures investors who deposit cash or securities with a broker. To be protected, however, an investor must come within the SIPA definition of "customer." 15 U.S.C. § 78*lll* (2) provides in pertinent part that:

> [t]he term "customer" of a debtor means any person (including any person with whom the debtor deals as principal or agent) who has a claim on account of securities received, acquired, or held by the debtor in the ordinary course of its business as a broker or dealer from or for the securities accounts of such person for safekeeping, with a view to sale, to cover consummated sales, pursuant to purchases, as collateral security, or for purposes of effecting transfer. The term "customer" includes any person who has a claim against the debtor arising out of sales or conversions of such securities, and any person who has deposited cash with the debtor for the purpose of purchasing securities . . . .

---

**1.** These background facts are undisputed. *See* Joint Pre–Trial Order, I. Stipulations of Fact 1–12.

**2.** Initially, the debtor's name was Jenmar Securities, Inc. Later, in March of 1987, its name was changed to Waddell Jenmar Securities, Inc.

SIPC contends that the claimants were not "customers" because the claimants did not entrust either cash or securities to Jenmar for the purpose of trading, investing or safekeeping.

The claimants contend that they entrusted both cash and securities to Jenmar, either directly, through its agent Mr. Waddell, or through its alter ego, WBP.

Although the essential issue is whether the claimants were "customers" of the debtor, other subsidiary issues include whether amendments to claims should be barred as being untimely, whether some of the claimed investments are "securities" as defined in SIPA § 78*lll* (14), whether the claimed securities are adequately described, whether the Salisbury Animal Hospital Pension and Profit Sharing Plan claim constituted a single claim or multiple claims for each employee, and whether WBP is the alter ego of the debtor.

### NUCKOLLS AND EASTERLING CLAIMS

At the conclusion of the trial, the court announced its decision with respect to the claims of Katherine B. Nuckolls and the joint claim of William E. and Ellyn R. Easterling. The court found that Dr. Nuckolls and Dr. and Mrs. Easterling were customers of the debtor and concluded that Dr. Nuckolls had a $50,000 claim for cash and that Dr. and Mrs. Easterling had a cash claim of $50,000 as well. The court's findings of fact and conclusions of law expressed in this memorandum opinion shall supplement those stated in open court, and, to the extent the findings and conclusions are inconsistent, those stated in this Memorandum Opinion shall control.

*Nuckolls and Easterling Facts*

Dr. Nuckolls dealt with Mr. Waddell in his capacity as agent for the broker-dealer, Jenmar. She was interested in purchasing U.S. Treasury Notes which are securities as defined in 15 U.S.C. § 78*lll* (14). She directed Mr. Waddell to consummate the transaction, and, on December 5, 1987, delivered a check (Plaintiffs' Exhibit # 176) for $50,000 to Mr. Waddell. At the direction of Mr. Waddell, the check was made

payable, not to Jenmar but to "Waddell Benefit Plan Trust Acct." Dr. Nuckolls had successfully purchased securities through Jenmar in the past utilizing that procedure and she acted reasonably in making the check payable to WBP. The funds were deposited in the WBP account, the U.S. Treasury Notes were never purchased, and Dr. Nuckolls lost $50,000.

Dr. and Mrs. Easterling also wanted to purchase $50,000 in U.S. Treasury Notes. Apparently, Mr. Waddell had advised them to refinance their home and to invest a portion of the proceeds generated from the refinancing in Treasury Notes. The Easterlings instructed Mr. Waddell to purchase the Treasury Notes and for that purpose on August 14, 1987 delivered to Mr. Waddell a $50,000 authorization to draw funds from their joint account with Prudential–Bache (Plaintiffs' Exhibit # 199). The payee on the authorization was left blank and the name of Waddell Benefit Plan Trust Account was subsequently added by a Jenmar employee, Melissa Cefalo. It is not clear whether the Easterlings knew that the authorization would be made payable to WBP, but even if they did, their actions were not unreasonable. The court finds that the Easterlings, like Dr. Nuckolls, dealt with Mr. Waddell in his capacity as agent for the broker-dealer, Jenmar. The $50,000 went from the Easterlings' Prudential–Bache account to WBP, the Treasury Notes were not purchased, and the $50,000 was misappropriated.

*Nuckolls and Easterling Discussion and Conclusions*

■ It is SIPC's position that Dr. Nuckolls and the Easterlings were not customers of Jenmar because Dr. Nuckolls and the Easterlings paid their funds to the WBP Trust Account, not to the debtor. SIPC argues that the facts are similar to those in *Brentwood, supra.,* in which claimants (Pepperdine University, Mike E. O'Neal and Mina Kolb McMurray) were determined not to have been "customers" because their checks were made payable to entities other than the broker-dealer. The Ninth Circuit reached this conclusion because neither the funds nor the securities

ever passed through the broker-dealer's hands. 925 F.2d 325, 328–329.

*Brentwood* is factually distinguishable. In *Brentwood,* the corporate recipients of the claimants' funds were companies for which the broker-dealer's agent was an officer or chairman of the board. These corporate recipients were also the objects of the intended investments. The *Brentwood* claimants were effectively bypassing the broker to deal directly with the entities issuing the securities. What distinguishes the Nuckolls and Easterling purchases from the purchases in *Brentwood* is that Nuckolls and Easterling were not attempting to circumvent the broker-dealer so as to deal directly with the entity issuing the securities. Dr. Nuckolls and the Easterlings were looking to the broker-dealer, Jenmar, to consummate their purchases. The claimants made cash available to Jenmar as broker-dealer for the purchases.

This is similar to the transactions which gave rise to two claims (second McMurray claim and Birmingham claim) allowed by the Ninth Circuit in *Brentwood.* 925 F.2d 325, 329–330. One of the claims, (second McMurray claim), involved an attempt to purchase IBM stock through the debtor dealer-broker. McMurray, at the instruction of the debtor's agent, made the check payable to the agent personally. The agent kept the funds, the shares were not purchased, and the claim was recognized. Similarly, in the Nuckolls transaction, Mr. Waddell, as agent for Jenmar, directed Dr. Nuckolls to make her check payable to WBP and the notes were never purchased.

The second allowed claim (Birmingham claim) in *Brentwood* involved the purchase of shares in a company for which the broker-dealer's agent was chairman of the board. The investor obtained a cashier's check, which the investor endorsed in blank and delivered to the agent, and gave instructions to the agent to purchase 10,000 shares of stock. The court found that the delivery of the check endorsed in blank was the equivalent of cash. The court further held that Birmingham was a "customer" since the cash went directly to the broker, and not to the company which was to have issued the securities, or to a third party. 925 F.2d 325, 329–330. This is somewhat similar to the blank check requisition executed by the Easterlings and given to Mr. Waddell to purchase notes on their behalf.

Based on the foregoing facts, the court concludes that Dr. Nuckolls has an allowable claim of $50,000 for cash and that the $50,000 cash claim of Dr. and Mrs. Easterling is allowable as well. These claims will be ALLOWED.

## THE SALISBURY ANIMAL HOSPITAL, P.A.'S PENSION AND PROFIT SHARING PLAN CLAIMS

*Salisbury Animal Hospital Facts*

■ Salisbury Animal Hospital, P.A. ("SAH") adopted pension and profit sharing plans in the late 1970's for the purpose of providing retirement benefits to SAH employees. The trustees of the plan were two SAH shareholders, Charles T. Steinman, Jr. and John C. Harroff. Initially, the plan was administered by an entity known as ADP, but the administration of the plan was transferred to WBP in 1980.

SAH made five annual employer contributions to the plan from 1981 to 1985 in the aggregate amount of $307,305.65. All of the contributions were made by checks payable to WBP.

As administrator of the SAH plan, WBP assisted the plan's trustees in establishing and maintaining separate ledger accounts in the name of each of the SAH claimants, which accounts were credited with the amounts of each annual contribution allocated to each participant, and their allocable shares of any prior year's contributions which had become forfeitures since the last plan year. (Pre–Trial Order, Stipulation # 20.) Following the close of each plan year, WBP assisted the plan's trustees in providing each of the SAH claimants with an individualized account statement showing the account balance at the beginning of each year, any changes during the year, the amount of SAH's contributions, including forfeitures, for that year allocated to his or her account, and the account balance

at the end of the year. (Pre–Trial Order, Stipulation # 21.)

Each employee participating in the plan could determine how that employee's portion of the plan funds would be directed. Once a year, Mr. Waddell would travel to Salisbury, North Carolina to meet with the plan participants. He would deliver an individual account summary to each employee, discuss investment strategy with each employee, and receive each employee's investment instructions. Mr. Waddell had access to the plan's funds administered by WBP. Ideally, those funds would be used to purchase securities through the broker-dealer, Jenmar, as directed by the employees. That procedure worked on numerous occasions, but Mr. Waddell misappropriated a substantial portion (by one estimate $199,915.43—Plaintiffs' Exhibit # 225) of the plan funds and many of the employees' investment instructions were not followed.

The claimants contend that they are "customers" of Jenmar because they directed Mr. Waddell, as agent for Jenmar, to purchase securities, and because Jenmar had access to the plan funds administered by WBP. When Jenmar actually did receive plan funds from WBP to purchase securities, the SAH affected employee was a "customer" of the broker-dealer for that transaction. The SAH claimants, however, were not "customers" with respect to the transactions upon which their claims are based. Although they may have instructed Mr. Waddell as agent of Jenmar to purchase securities on behalf of their accounts, *none* of the plan's funds were delivered to Jenmar to effectuate the purchases. The funds were clearly misappropriated, but the funds were essentially stolen from the plan and never reached the broker-dealer, Jenmar. It is true that Jenmar had access to the plan funds with WBP, but that access was not utilized by Jenmar in connection with these specific SAH claims.

*Steinman Claim*

Dr. Steinman was a plan trustee and, as one of the primary shareholders of SAH, had the largest share of the plan assets. He had more investment activity in his portion of the plan and he spoke with Mr.

Waddell on a more frequent basis than did the other SAH employees.

Dr. Steinman's last plan account statement (Plaintiffs' Exhibit # 11) indicates that as of December 31, 1987 he held, among others, the following investments:

(A) 1,771.34 units of Pru–Bache Government Plus Fund II

(B) 1400 Zero Coupon Bonds–Treasury, 10.95% due 1–1–93

(C) 665 units of Integrated Res. AIM–84

(D) Money Market Account, value $1,618.00

(E) 68 units of Angeles Income Properties

(F) 51 units of Angeles Income Properties IV

(G) 10 units of Angeles Partners X

(H) 5 units of De Anza X79

(I) 10 units of Venture Partners

■ Dr. Steinman's original claim is for items A, B and C and for 144,744.81 units of a Money Market Fund. After SIPC denied the claim, an amended claim was filed for items A, B and C and for a credit balance, or cash totalling $98,898.10. SIPC objected to the amendment on the grounds that the amendment was an untimely filed new claim. The court finds that the claims asserted in the amendment arose out of the same general conduct and transactions which form the basis of the original claim and that the amendment is not prejudicial to SIPC. Consequently, the amendment is allowed.

Dr. Steinman claims that he directed Mr. Waddell, acting for Jenmar, to purchase 1,771.34 units of Pru–Bache Government Plus Fund II, 14 zero-coupon bonds, and 665 units of Integrated Resources AIM–84, and that Jenmar had access to the plan funds administered by WBP from which the purchases could be made. The last statement which WBP provided to Dr. Steinman reflected that the stocks were held for his benefit, but Dr. Steinman never received those securities. He now claims $42,505.14, the value of the three investments.

Notwithstanding the listing of the three securities on the statement provided by WBP, it has not been shown that the stocks were ever purchased through Jenmar. If they were in fact purchased, there has been no showing that these securities were held by Jenmar. If the investments were held by any entity, it was the plan's administrator, WBP.

Dr. Steinman also makes a claim for cash in the amount of $94,624.89. A portion of that claim, $14,624.89 is based on income from five investments (Angeles Income Properties, Ltd., Angeles Income Properties IV, Angeles Partners X, De Anza X79, and M.L. Venture Partners) which he never received. There is no evidence, however, that these investments were being held by Jenmar or that Jenmar received the income.[3] The court finds that any income from these five investments was paid to WBP not Jenmar.[4]

The remaining portion of Dr. Steinman's claim for cash is for $80,000 and arises from his instructions to Mr. Waddell on November 27, 1987 to purchase 1,000 shares of Occidental, 1,000 shares of Texaco, and 250 shares of Ford for an aggregate price of $80,000 (Plaintiffs' Exhibit # 38). Jenmar was to take the funds from the plan account at WBP and purchase the stock. The stock was not purchased, but it has not been shown that the funds ever made it from WBP to Jenmar. Dr. Steinman was not a "customer" of Jenmar in connection with any of the transactions which he contends support his claims.

*Strasser Claim*

John M. Strasser was an employee of SAH and a participant in its plan. He left SAH in August, 1983 to start his own veterinary practice, but left his funds in the SAH plan to be administered by WBP. Dr. Strasser continued to meet with Mr. Waddell and continued to direct the investment of his share of the SAH plan funds. Dr. Strasser's last plan statement (Plaintiffs' Exhibit # 54) showed that as of August 31, 1985 the following investments, among others, had been purchased for his plan account:

(A) U.S. Treasury Bonds (9), value $11,213.78

(B) Money Market Account, value $3,605.31

(C) 20 units National Lease Income Fund

(D) 10 units National Completion Fund

(E) 20 units Angeles Income Properties

(F) 300 units Ala Moana Hawaii

(G) .15297 units IBM Reinvestment Shares

(H) 19 annuities of National Home Life

Dr. Strasser's original claim is for items A, C, D, E and H, and for 21,281.86 units of a money market fund. After SIPC denied the original claim, Dr. Strasser filed an amended claim for items A, B and H, and for a credit balance or cash totalling $17,802.28 representing dividends (National Lease—$2,300.00, National Completion—$493.46, Angeles Income—$8,438.08, Ala Moana—$480, IBM—$172.00, Resources Pension dividends—$1,644.99), the proceeds from the sale of Resources Pension Shares —$2,147.50 (as of 9/1/87), and funds transferred but not received by the original plan administrator, ADP—$2,126.25. SIPC objects to the amendment on the grounds that the amendment is an untimely filed new claim. The court finds that the claims asserted in the amendment, with the exception of the ADP claim, arose out of the same general conduct and transactions which form the basis of the original claim and that the amendment is not prejudicial

---

**3.** A Change of Dealer form dated 11/22/83 lists Jenmar as the dealer (Plaintiffs' Exhibit # 12) on the Angeles Income Properties, Ltd. account, but there is no evidence that the income from that investment was sent to Jenmar. A subscription agreement (Plaintiffs' Exhibit # 19) for Angeles Income Properties IV also shows Jenmar to be the dealer, but the agreement clearly provides that income checks are to be paid to WBP. The De Anza X checks were payable to WBP (see Defendant's Exhibit B). The checks from M.L. Venture Partners were cashed by WBP (Plaintiffs' Exhibit # 20).

**4.** At the trial, Dr. Steinman offered written statements that he had received from the five entities showing the income which he should have received. The court sustained SIPC's hearsay objection to these documents pursuant to Rule 802 of the Federal Rules of Evidence.

to SIPC. The amendment as to those claims is allowed. The amendment as to the ADP claim is an entirely different claim and will not be allowed as it constitutes a new claim filed in October, 1990, well beyond the bar date of November 13, 1989.[5]

Dr. Strasser maintains that his last statement listed securities which he never received—9 U.S. Treasury Bonds, 3,605.31 units of a money market account, and 19 units of National Home Life having an aggregate value of $40,370.45. That may be so, but that does not establish that those securities were being held by Jenmar for Dr. Strasser.

After Jenmar, WBP, and related Waddell corporations became the subject of state court receiverships, the receiver located securities belonging to Dr. Strasser. The claimant argues that cover letters signed "Receiver for Waddell Jenmar Securities, Inc." transmitting these securities to Dr. Strasser shows that Jenmar held securities for Dr. Strasser. The investment shares, however, clearly indicate that they were issued to SAH c/o WBP, Inc. (Plaintiffs' Exhibits # 55 and 56)[6] and the receiver, Robert Epting, testified that he did not know which of the Waddell entities held the securities. Dr. Strasser has not met his burden of showing that he was a "customer" with respect to these three investments. Similarly, he has not shown that he was a Jenmar "customer" with respect to the dividends paid but not received.[7] The evidence supports a finding that investment dividends were sent to WBP not Jenmar. For example, a National Lease distribution check (Plaintiffs' Exhibit # 59) was made payable to WBP. Dr. Strasser maintains that the dividends, pursuant to his instructions, should have been reinvested in additional securities. But, even if that is

true, he still has not shown that the dividends ever made their way to Jenmar, or that Jenmar held the securities for his benefit. He is thus not a customer for these transactions under 15 U.S.C. § 78*lll* (2).

The only transaction for which Dr. Strasser (or any SAH claimant) was a "customer" that gives rise to a claim is the sale of Dr. Strasser's Resources Pension Shares, Inc. stock. The circumstances surrounding this transaction are somewhat unclear, but what is known is that Jenmar, by letter (Plaintiffs' Exhibit # 63) dated September 2, 1987, signed by F. Elizabeth Waddell, requested Dr. Strasser to execute a letter drafted by Jenmar authorizing the sale of his Resources Pension Shares, Inc. stock. The authorization was addressed to Integrated Services, Inc. and directed that the shares be liquidated, that the proceeds be payable to SAH and that the check be mailed to Waddell/Jenmar Securities, Inc. Dr. Strasser received neither the shares nor the cash proceeds and the court finds that Jenmar misappropriated those proceeds in the amount of the value of those shares, $2,147.50. Jenmar was involved in the transaction to sell these securities and Dr. Strasser's reasonable expectation was that Jenmar would see that the shares were sold and that he would receive the proceeds. That did not happen. Dr. Strasser was a "customer" of Jenmar and as a result suffered a loss of $2,147.50.[8]

### Douglass Claim

Margaret M. Douglass was employed as a veterinarian with SAH from 1981 to 1989. She met with Mr. Waddell on an annual basis, received reports concerning the status of her portion of the SAH plan, re-

5. Even if the amendment is considered to be timely, the claim would not be allowed. The transfer was between plan administrators ADP and WBP. Jenmar was not involved; in fact, at that point Jenmar had not been formed.

6. One of these certificates is made out merely to the SAH plan.

7. At the trial Dr. Strasser offered statements he received to show income which he should have received. The court sustained SIPC's hearsay

objection to these documents pursuant to Rule 802 of the Federal Rules of Evidence.

8. SIPC contends that Dr. Strasser has no claim for transactions involving National Completion Fund and National Home Life because they are not "securities" as defined in 15 U.S.C. § 78111(14). Dr. Strasser testified that these investments are variable rate annuities which are securities. The court need not address that issue because either way the claim is denied.

ceived investment advice from Mr. Waddell, and directed him to make purchases of securities from the funds in her SAH plan account. Specifically, she instructed Mr. Waddell, as an agent for Jenmar, to purchase Royce Value Fund (75% of her funds) and Integrated Resources AIM (25% of her funds). According to her last plan statement provided by WBP (Plaintiffs' Exhibit #88) her account included $5,800 of Royce Value Fund, $5,400 of Integrated Resources AIM and a money market account and cash of $12,078.51. Dr. Douglass instructed Mr. Waddell to use all the cash to increase her investment in Royce Value Fund and Integrated Resources AIM. That was not done, and Dr. Douglass now claims Royce Fund securities valued at $3,628.77 and Integrated Resources AIM–84 securities valued at $4,736.84. She also claims the money market account of $12,078.51 or, in the alternative, $10,000.00 as a cash claim for funds made available to Jenmar to purchase more Royce and Integrated securities.

The court finds, however, that Dr. Douglass was not a Jenmar "customer" with respect to the transactions that gave rise to her claims. There has been no showing that Jenmar held the Royce or Integrated investments for her benefit. As is the case with the other SAH claimants, the securities were held by WBP.

The court finds that Dr. Douglass gave instructions to Mr. Waddell as agent for Jenmar to purchase more Royce and Integrated securities, but Dr. Douglass has failed to show that the funds from her SAH administered plan ever made it to Jenmar. Although Jenmar had access to those funds, it has not been shown that the funds were utilized by Jenmar. The same is true with respect to the Karriker and Smith claims.

### Karriker and Smith Claims

Bonnie H. Karriker and Pamela H. Smith were both employees of SAH who, according to their last plan statements provided by WBP (Plaintiffs' Exhibits #79 and #83), had accumulated cash of $16,640.88 and $11,620.82, respectively, as of May 31, 1986. Both Ms. Karriker and Ms. Smith directed Mr. Waddell, as agent of Jenmar, to purchase Royce Investment Fund and Integrated Resources AIM. These securities were never purchased and neither Ms. Karriker nor Ms. Smith received her money. Nevertheless, they have not shown that their money market funds were held by Jenmar, and the court finds that their funds were held by WBP. Also, these two claimants have not shown that the funds were ever delivered from WBP to Jenmar to make the Royce or Integrated investments. Jenmar may have had access to these funds, but the funds were not delivered to Jenmar by WBP. Consequently, neither Ms. Karriker nor Ms. Smith was a "customer" of Jenmar.

### Moody Claim

The last of the SAH claimants is Miles A. Moody. Dr. Moody was a SAH plan participant for only 1 year and never met with Mr. Waddell. The last SAH plan statement (Plaintiffs' Exhibit #74) provided to Dr. Moody by WBP showed, as of May 31, 1986, an investment in Integrated Resources AIM of $5,000 plus money market funds and cash of $2,874.73. Dr. Moody's amended claim is for Integrated securities of $4,736.84 and a money market fund of $2,474.73. Alternatively, he claims cash of $7,474.73 based on the failure of the debtor to purchase securities. The court finds that Dr. Moody was not a "customer" of Jenmar. He has not shown that Jenmar held any securities for his benefit, or that he instructed Jenmar to purchase securities on his behalf, or that funds were transferred to Jenmar from his SAH plan account for that purpose.

### SAH Discussion and Conclusions

Based on the court's findings that none of the SAH claimants, except Dr. Strasser, were "customers" of the broker-dealer Jenmar, the court concludes that the claims of Dr. Steinman, Dr. Douglass, Ms. Karriker, Ms. Smith and Dr. Moody should be DENIED. The amended claim of Dr. Strasser shall be ALLOWED, but only in the amount of $2,147.50; Dr. Strasser's re-

**944**

maining claims are DENIED.[9]

*Jenkins Claims*

The claims made by E. Earl Jenkins, Jr. are in most respects very similar to the claims of the SAH claimants. Dr. Jenkins, a pathologist, was initially self-employed as E. Earl Jenkins, Jr., M.D., P.A. and participated in a pension plan administered by WBP. In 1984, Dr. Jenkins formed York Pathology Associates, P.A. which also had a pension and profit sharing plan administered by WBP. Contributions were made to the plan by direct payment from Jenkins and York to WBP. A separate ledger was maintained for each employee participating in the plan and each employee had the right to control the investment of the employer's plan share.

WBP as plan administrator provided an annual statement of each participant's account and Mr. Waddell would meet with the participants to provide investment advice. Each employee could choose a broker to effectuate the transfers of securities in the account, and Dr. Jenkins chose as his broker, his college fraternity brother, Mr. Waddell. At first, Mr. Waddell consummated securities transactions as an agent for Integrated Resources Ltd., and after the registration of Jenmar in September, 1983, Mr. Waddell acted as the debtor's agent.

The procedure for purchasing securities was essentially the same as that employed for the SAH plan. Dr. Jenkins would give instructions to Mr. Waddell, as agent for Jenmar, to purchase securities and Mr. Waddell, who had unlimited access to the plan funds administered by WBP, would take the plan funds and consummate the transactions. On many occasions, securities were purchased in just that way, but not always. Dr. Jenkins' suffered a substantial loss and has filed claims for securities aggregating $154,822.88.

The last statement provided by WBP to Dr. Jenkins (Plaintiffs' Exhibit # 114) lists 100 shares of IBM (corrected by Dr. Jenkins to 200 shares) valued at $22,100, 1,373.76 units of American Capital Pace Fund worth $28,532.99, 641.79 units of Royce Value Fund valued at $4,466.86, 10 units [10] of Angeles Income Properties, II, at $6,500.00, 1,738 units of Integrated Resources AIM–84 worth $31,284.00, and 35 zero-coupon bonds at 11.25% due 1993 at $34,750. Dr. Jenkins did not receive these securities and has filed a claim for securities of $127,633.85. Dr. Jenkins also claims money market funds of $27,189.03 as a security or, in the alternative, $27,000.00 as a cash claim based on instructions given to the debtor to purchase Royce Value Fund units and zero-coupon bonds in that amount.

As is the case with the SAH claimants, the statements provided by WBP do not establish that Jenmar purchased the listed securities or that the debtor held the listed securities for Dr. Jenkins' benefit. If the securities were held, they were held by WBP as plan administrator. There is also no showing that the funds ever were transferred from WBP to Jenmar to purchase the securities claimed.

Dr. Jenkins contends, however, that his situation is somewhat different than that of the SAH claimants because he was given a written confirmation from Jenmar of the securities purchased. The "confirmations" are 2 unsigned documents on Jenmar letterhead (Plaintiffs' Exhibit # 125).

The first document is an "agenda" of topics to be discussed between Mr. Waddell and Dr. Jenkins at a meeting on October 15, 1986. The agenda does not list any of the claimed securities, but one of the agenda items is "Investment History," which is the title of the second document. The investment history is somewhat obscure, but the first column appears to be a list of securities which includes "IBM/23600,"

9. SIPC had argued that the SAH claimants were limited to one aggregate claim rather than each having individual claims. The issue would only be relevant if the aggregate allowed claims exceeded the SIPC claim limit. That is not the case here, and that issue need not be addressed.

10. The statement actually lists 40 units of Angeles Income Properties, II, but Dr. Jenkins only claims 10 units.

"AMCAP/Pace 30000," "AIP/45000," "AIM/34750," and "U.S. Treas. 37000." These two documents are certainly not formal confirmations of transactions and do not establish that the listed securities were being held by Jenmar for the benefit of Dr. Jenkins. Since Dr. Jenkins has not met his burden of proof, the court finds that Dr. Jenkins was not a "customer" of Jenmar in connection with the transactions for which losses are claimed.

*Jenkins Conclusion*

Based on the court's finding that Dr. Jenkins was not a "customer" of the debtor with respect to the securities and cash claimed, Dr. Jenkins' claims are DENIED.

## HATCH CLAIMS

*Hatch Facts*

Mabel P. Hatch is 94 years old and resides at the Methodist Retirement Home in Durham, North Carolina. In 1982, prior to the formation of Jenmar, Mrs. Hatch was an investment advisor client of WBP. In 1985, Mrs. Hatch became an investment client of Jenmar and executed a letter of understanding which memorialized that relationship (Plaintiffs' Exhibit # 213). Mrs. Hatch trusted Mr. Waddell. He gave her financial advice, he administered her assets, he visited her 2 or 3 times a week, he helped her run errands, and he took advantage of that relationship to steal $1,000,000 from her (see Plaintiffs' Exhibit # 228). Mrs. Hatch now asserts claims of $429,-998.22 (limited to $100,000) for cash and $267,779.00 for securities.

■ SIPC's first defense is that most of the claims are untimely filed. Mrs. Hatch contends that an amendment filed after the claims bar date relates back to the date of the original timely filed claim. The court agrees with Mrs. Hatch and will allow the amendment as a timely filed claim.

The initial claim was filed for "specifically identified securities in the amount or value of $430,000" (Plaintiffs' Exhibit # 205). The securities included Damson Oil securities—$120,000, limited partnership securities—$160,000, and U.S. Government Securities—$150,000. The amended claim (Plaintiffs' Exhibit # 207) expands the claims to include securities of $147,775 as follows:

| | | |
|---|---|---:|
| (1) | 1,000 shares Home Savings & Loan | $13,000.00 |
| (2) | 100 shares Central Carolina Bank | 3,425.00 |
| (3) | 100 shares IBM | 15,500.00 |
| (4) | Treasury Notes | 42,000.00 |
| (5) | 56.4 units of National Lease Income Fund | 49,000.00 |
| (6) | 400 shares Central Carolina Bank Financial Corp. | 15,000.00 |
| (7) | 1200 shares Home Savings & Loan | 18,019.21 |

These securities are listed on a "portfolio summary" which was attached to the original claim.

In addition to the claim for securities, the amended claim also claimed cash of $429,-998.22 as follows: $160,000—"For Stock Market Investments," $150,000—"Kemper," $61,880.76—Royce Value Fund, $58,-117.46—American Capital Government Securities. The cash amounts correspond to the cash claims made in the original claim and the securities related to the amended cash claims correspond to the broad categories of securities described in the first claim. The court finds that the amended claims arose out of the same general conduct and transactions which form the basis of the original claim and that the amendment is not prejudicial to SIPC. At the conclusion of the evidence, Mrs. Hatch again amended her claim (see Plaintiffs' Exhibit # 271) to eliminate the securities claim for 1,000 shares of Home Savings and Loan and to add a $60,000 claim for the security Damson Oil. This final amendment also relates to the same transactions and the amendments are allowed.

■ There is no doubt that Mrs. Hatch suffered an enormous loss as a result of Mr. Waddell's fraud, but as with the other claimants, she will only have a claim against the debtor if she was a Jenmar "customer" with respect to the transactions that gave rise to the loss.

Mrs. Hatch regularly received portfolio summaries, the last being in November, 1987 (Plaintiffs' Exhibit # 223) which listed four of the securities claimed, 1,000 shares,

Home Savings & Loan, 100 shares, Central Carolina Bank, 100 shares, IBM, and 420 units in a Treasury Note Account. Mrs. Hatch did not receive those four securities and now claims their value. As previously seen with respect to the SAH and Jenkins claims, however, a list of securities without more does not establish that Jenmar held securities for the claimant. It is just as likely, in fact more so, that WBP, not Jenmar, held the securities for Mrs. Hatch.

There is convincing evidence, however, that Jenmar sold two of the four securities, 1,200 [11] shares of Home Savings and Loan and 100 shares of CCB. The 1,200 shares of Home Savings and Loan stock was sold in July, 1987 (see Plaintiffs' Exhibit # 221) and Mrs. Hatch never received the proceeds. Mr. Waddell testified that the CCB stock, which was owned by Mrs. Hatch before her association with Mr. Waddell, was also sold and the proceeds misappropriated. Mr. Waddell testified that any brokerage transactions for Mrs. Hatch were handled by Jenmar. That appears to be so and the court finds that Mrs. Hatch was a Jenmar "customer" with respect to the Home Savings and Loan and CCB sales.

Apparently, the sales proceeds of these sales were paid to an account at NCNB National Bank for Mrs. Hatch's benefit. It could be argued that she actually received the sales proceeds because the funds made it to that account. But, the account was controlled by Mr. Waddell who, as he had done in the past, embezzled the funds. Mr. Waddell was Jenmar's agent and consequently Jenmar knew that Mrs. Hatch would not ultimately receive the proceeds.

The same is true with respect to four other sales of securities effectuated by Jenmar—56.4 units of National Leasing Income Fund, 400 shares of Central Carolina Bank Financial Corp., Royce Value Fund ($61,880.76), and American Capital Government Securities ($58,117.46). The National Leasing securities were transferred to other Jenmar customers, a transaction clearly affected by Jenmar as her broker-dealer. The 400 shares of CCB Financial Corp. were sold in February, 1987 through Pru-Bache with Jenmar as the introducing broker (see Plaintiffs' Exhibit # 220). The Royce Value Fund was redeemed in May, 1986 and as stated in the Royce statement (Plaintiffs' Exhibit # 218), Jenmar was Mrs. Hatch's dealer. Similarly, the American Capital Government Securities were redeemed in April, 1985 and Jenmar's name appears on the redemption confirmation (Plaintiffs' Exhibit # 217). The court finds that Mrs. Hatch was a "customer" of Jenmar with respect to the National Leasing, CCB Financial, Royce and American Capital sales. These sales involved "securities" and as a result of the sales, Mrs. Hatch suffered losses in the amount claimed.

Mrs. Hatch concedes that she authorized the sales of the Royce and American Capital securities and thus claims a "cash" loss for the proceeds. The court also finds that she, according to Mr. Waddell's testimony, authorized the sale of the Home Savings stock as well as the sale of the National Lease Income Fund. The court finds that she did not authorize the sale of 100 shares of CCB stock or the sale of 400 shares of CCB Financial Corp. stock.

Mrs. Hatch asserts a claim for $150,000 which she contends that she gave to Mr. Waddell to purchase shares of "Kemper." (Plaintiffs' Exhibit # 211). Mrs. Hatch delivered a check on the amount of $150,000 to Mr. Waddell in December, 1985; the check was made payable to WBP and states that it was given for "Kemper." Mr. Waddell testified that the check was given to purchase units of a Kemper Tax Exempt Money Market Fund. Although the check was made payable to WBP, Inc., the transaction was to be handled by Jenmar. Mrs. Hatch was thus a Jenmar "customer" in that regard. The investment was not made and Mrs. Hatch suffered a loss.

As to the remaining Hatch claims, the court finds that Mrs. Hatch was not a

11. The 1,000 shares of Home Savings and Loan stock was increased to 1,200 shares as a result of a stock dividend.

"customer" of the debtor with respect to 100 shares of IBM stock, 420 units of Treasury Notes, Damson Oil, and $160,000 in cash to purchase securities. Although the IBM stock is listed on the last portfolio statement, it has not been established that the security was held by Jenmar. The evidence does support a finding that the stock was given by Mrs. Hatch to her sister as a gift and that no loss was sustained.

There also has not been a showing that the Treasury Notes listed on the portfolio summary were held by Jenmar, or that funds were delivered to Jenmar to purchase that security. Apparently $42,000 was to be taken from the WBP fund to purchase the Treasury Notes, but the court is not persuaded that the funds ever made it to Jenmar for that purpose.

There are several problems with the Damson Oil claim. First, it has not been established that Damson Oil is a security for purposes of SIPA. *See,* 15 U.S.C. § 78111(14). Although funds may have been delivered to Mr. Waddell to purchase Damson Oil those funds were delivered in August, 1983, (Plaintiffs' Exhibit # 205), *prior* to the registration of Jenmar as a broker-dealer in September, 1983. Finally, even if Damson Oil was purchased, it has not been shown that Jenmar ever held that investment for Mrs. Hatch.

The cash claim for $160,000 is based on a check (Plaintiffs' Exhibit # 211) drawn on Mrs. Hatch's account and made payable to WBP. Mrs. Hatch contends that the check was delivered to Mr. Waddell to purchase "Stock Market Investments." It is not at all clear what was supposed to have been purchased with those funds. The court finds that the description "For Stock Market Investments" is entirely too vague to identify any securities which were to have been purchased.

*Hatch Discussion and Conclusions*

Mrs. Hatch has established that she was a Jenmar "customer" in connection with the following securities for which she suffered a loss:

| | LOSS |
|---|---|
| 100 shares Central Carolina Bank | $ 3,425.00 |
| 56.4 units of National Lease Income Fund | 49,000.00 |
| 400 shares Central Carolina Bank Financial Corp. | 13,700.00 |
| 1200 shares Home Savings and Loan | 15,600.00 |
| Royce Value Fund | 61,880.76 |
| American Capital Government Securities | 58,117.46 |

There is a limit of $100,000 on cash claims and it is essential to classify each claim. 15 U.S.C. § 78fff-3(a)(1). All of the transactions involve the sale of securities by Jenmar. Claims involving sales *authorized* by Mrs. Hatch (National Leasing, Home Savings and Loan, Royce, and American Capital) are claims for cash subject to an aggregate $100,000 limit. Net equity claims of customers shall not exceed an aggregate of $500,000. 15 U.S.C. § 78fff-3(a). Claims involving sales which were *not authorized* by Mrs. Hatch (CCB and CCB Financial Corp.) are claims for securities. Mrs. Hatch also has a cash claim for $150,000 in connection with the purchase of Kemper Tax Exempt Money Market Fund, but that is also subject to the $100,000 aggregate limit. The court concludes that Mrs. Hatch has a claim for securities of $17,125.00 and a claim for cash of $100,000 and those claims are ALLOWED.[12] All other claims are DENIED.

*Alter Ego*

■ It is the claimants' position that Jenmar and WBP were essentially the same entity and that under the alter ego theory, Jenmar is responsible for the fraudulent acts of Mr. Waddell and WBP. The claimants maintain that Mr. Waddell controlled both entities, that corporate entities were

12. SIPC asserts that Mrs. Hatch brought suit against a bank to recover a portion of the losses she sustained in her dealings with Mr. Waddell, and that her recovery must be set off against any amount awarded in this case. The suit was settled and SIPC contends that any claim Mrs. Hatch has against the debtor should be reduced by any recovery she received from the bank. Mrs. Hatch is not entitled to a double recovery for her losses, but given the magnitude of her total losses and the amount of the recovery from the bank, there is no danger that she has been overly compensated, and setoff is inappropriate.

ignored, that funds were commingled, and that both entities engaged in a joint scheme to defraud their customers. The evidence, however, does not support that theory.

Mr. Waddell consistently isolated Jenmar's financial affairs from those of WBP, because, as a registered broker-dealer, Jenmar was subject to periodic audit by an outside auditor.

The SAH claimants, Dr. Jenkins, and Mrs. Hatch all had unlimited faith in Mr. Waddell. They all entrusted their funds to WBP. Mr. Waddell had access to their funds and he utilized those funds for his benefit. That does not mean, however, that all companies owned by Mr. Waddell are responsible for Mr. Waddell's theft or embezzlement from the WPB administered funds. More specifically, Jenmar, and thus SIPC, is only responsible for those losses in which a claimant was a "customer" as that term is so carefully defined in 15 U.S.C. § 78*lll* (2).

An appropriate judgment shall be entered.