KOZINSKI, Circuit Judge:
This case is about a securities broker-dealer that went bankrupt and some disappointed investors. We consider whether these investors are protected by the Securities Investor Protection Act (SIPA), 15 U.S.C. §§ 78aaa-78III, and are thus entitled to payments from the insurance fund maintained by the Securities Investor Protection Corporation (SIPC).
I
Brentwood Securities, Inc. was a securities broker-dealer founded in 1976 and registered with the Securities and Exchange Commission. Its office was located in Los Angeles, California. Prior to November 1981, Brentwood was owned by Nils An-gert; in that month Angert sold the business to Christopher Delahunty who became Brentwood’s sole shareholder and president. Angert remained with Brentwood as vice-president. In 1985, a district court ordered that Brentwood be liquidated. It placed Brentwood’s customers under the protection of the SIPA and named the SIPC as trustee. The case was removed to bankruptcy court for further proceedings.
Among those who filed claims with the SIPC were appellees Pepperdine University, Mike E. O’Neal, Mina Kolb McMurray and John Birmingham. The SIPC denied their claims in whole or in part, and appel-lees filed oppositions in bankruptcy court. The court ordered the SIPC to make payments to each of the appellees. The SIPC appealed, and the Bankruptcy Appellate Panel (BAP) affirmed in nearly all respects. In re Brentwood Securities, Inc., 87 B.R. 602 (9th Cir.BAP 1988). The SIPC has appealed once again.
II
The SIPA protects the assets of investors held by broker-dealers who become insolvent. It was passed by Congress in 1970 after a wave of brokerage house failures in the late 1960s. The Supreme Court discussed the background and purposes of the SIPA in Securities Investor Protection Corp. v. Barbour, 421 U.S. 412, 95 S.Ct. 1733, 44 L.Ed.2d 263 (1975):
Customers of failed firms found their cash and securities on deposit either dis *327 sipated or tied up in lengthy bankruptcy proceedings. In addition to its disastrous effects on customer assets and investor confidence, this situation also threatened a “domino effect” involving otherwise solvent brokers that had substantial open transactions with firms that failed. Congress enacted the SIPA to arrest this process, restore investor confidence in the capital markets, and upgrade the financial responsibility requirements for registered brokers and dealers.
Id. at 415, 95 S.Ct. at 1736 (citations omitted).
The SIPA created the SIPC, a non-profit corporation composed of most registered brokers and dealers. 15 U.S.C. § 78ccc. Not unlike the FDIC, the SIPC insures investors who deposit cash or securities with a broker against the risk of broker insolvency. The SIPC maintains a fund for investor protection, supported by mandatory assessments from its members based on their gross revenues (15 U.S.C. § 78ddd); oversees the liquidation of brokers and dealers (15 U.S.C. § 78eee); and makes payments, up to certain limits, to investors who deposited cash or securities with failed broker-dealers (15 U.S.C. § 78fff-3(a)).
The SIPA is carefully crafted, precisely delineating the category of investors it protects. Specifically, only a “customer” of a registered broker-dealer may recover from the fund; the SIPA defines a customer as
any person ... who has a claim on account of securities received, acquired, or held by the debtor in the ordinary course of its business as a broker or dealer from or for the securities accounts of such person for safekeeping, with a view to a sale, to cover consummated sales, pursuant to purchases, as collateral security, or for purposes of effecting transfer. The term “customer” includes any person who has a claim against the debtor arising out of sales or conversions of such securities, and any person who has deposited cash with the debtor for the purpose of purchasing secuñties_
15 U.S.C. § 78III (2) (emphasis added).
This definition embodies a common-sense concept: An investor is entitled to compensation from the SIPC only if he has entrusted cash or securities to a broker-dealer who becomes insolvent; if an investor has not so entrusted cash or securities, he is not a customer and therefore not entitled to recover from the SIPC trust fund.
Ill
We must determine whether any of the claimants fits within the SIPA definition of customer. More specifically, we must determine whether, on this record, any of them has established that they entrusted cash or securities to Brentwood. If claimants entrusted cash and/or securities to Brentwood and suffered a loss because it became insolvent, they are entitled to recover; if not, not.
A. The Pepperdine and O’Neal Claims
Appellees Pepperdine University and Mike O’Neal, a financial officer of Pepperdine, had trading accounts with Brent-wood. In November 1983, Delahunty approached Pepperdine and O’Neal with an investment opportunity. CR 1, at 5; CR 21, Attachment 1, at 2.[1] He told them that he was an officer in a company called Com-stock Mining and that a public offering of its stock was in the works.[2] He suggested they get in on the deal before the public offering drove up the share price. He even offered to repurchase any of the shares in the event they were not marketable on the open exchange. CR 5, at 3. This personal guarantee was put in writing. CR 15.
*328 Pepperdine snapped up 40,000 shares for $100,000 and O’Neal 2400 shares for $6000. CR 1, at 5; CR 21, Attachment 1, at 2. Following Angert’s instructions, they each brought cheeks made out to Comstock to Brentwood’s office. Id. These checks were subsequently deposited by Comstock. CR 14 and CR 30. They never received any shares or stock certificates. A few months after the purchase, Pepperdine decided to get out of this investment and asked Dela-hunty to sell the Comstock shares. Dela-hunty informed Pepperdine a few weeks later that he had complied by selling the shares for a total of $125,000, but he did not remit the proceeds. CR 1, at 5. The SIPC determined that the shares were never issued. CR 2, at 2. Comstock’s records did not show that shares were ever held in Pepperdine or O’Neal’s names. CR 7, at 3.
Brentwood’s involvement in these transactions, if any, has not been established. Both Pepperdine and O’Neal had trading accounts with Brentwood, but admit they never clarified whether they were dealing with Delahunty directly as an officer of Comstock, or whether Brentwood was to serve as a broker for the purchases. CR 4, at 3-4, II17; CR 5, at 4, K 26. Claimants say they assumed the transactions were conducted through their Brentwood accounts. CR 4, at 3, ¶ 16; CR 24, at 5, II30. But they acknowledge that these transactions did not appear on their account statements, CR 4, at 5, 1128, and that they did not know whether Brentwood received a commission for the purported purchases. CR 26, at 2, 119. Nothing in the record establishes that Brentwood, in fact, had any role at all in these transactions.
A straightforward application of the statutory definition of customer leads to the conclusion that Pepperdine and O’Neal do not have legitimate claims against the SIPC trust fund. To recover they must establish that they entrusted either cash or securities to Brentwood prior to its insolvency; they did neither. Brentwood was not holding their securities because Com-stock never issued any securities for Brent-wood to hold. Nor was Brentwood holding their cash at the time of insolvency, or at any other time, for the simple reason that Pepperdine and O’Neal made their checks out directly to Comstock. Comstock endorsed and deposited the checks; Brent-wood never held the funds.[3] In short, as far as the record discloses, Brentwood was not involved in the transactions at all.[4]
B. The McMurray Claim
McMurray’s claims are similar. She had a trading account with Brentwood and attempted to purchase shares of a company known as American Mineral Resources (AMR) on Delahunty’s recommendation.[5] Delahunty was chairman of the board of AMR, but McMurray claims that he did not disclose this. CR 35, at 2-3, 1111, 14. She first attempted to purchase 20,000 shares by making out a check for $20,000 payable to “AMR/Delahunty,” per Delahunty’s instructions. The following year, she sought to purchase another $75,000 worth of AMR; she made her check out to “American Mineral Resources,” again per Delahunty’s instructions. The first check was endorsed by Delahunty and the second was endorsed as follows: “Deposit to Credit of Payee.” CR 32, Exhibits 4 and 6. McMurray never received the shares or stock certificates. CR 32, at 5. The purchases did not appear on her Brentwood account statements. Again, it is unclear that the shares were ever issued.
*329 It had been McMurray’s understanding that Brentwood would serve as her broker for these purchases and that they would be reflected in her Brentwood trading account. CR 35, at 2-4. When these transactions did not show up on her account statements and she did not receive the stock certificates or shares, McMurray made several inquiries of Delahunty. CR 35, at 3-4, 1t 17 and at 5-6, 11 25-26. Dela-hunty assured her that the securities had been purchased and that they were in her Brentwood account. CR 35, at 5-6, ¶ 26.
McMurray does not meet the SIPA definition of customer. As with the Pepper-dine and O’Neal claims, it is not clear that Brentwood had any role in the transactions. She made out checks directly to AMR for the issuance of shares; these funds never passed through Brentwood’s hands. The shares also never passed through Brent-wood’s hands because they never came into existence. Regardless of what McMurray thought was in her Brentwood trading account, it did not in fact ever contain either her securities or her cash.
McMurray filed two other claims with the SIPC. First, she claimed $10,000 in connection with her attempted investment in a limited partnership known as Communications Development Company (CDC). The SIPC denied this claim, but the bankruptcy court granted it. The BAP reversed the bankruptcy court, concluding that this investment was not covered by the SIPA in any event. We affirm this decision. MeMurray’s interest in CDC was not a security as defined by the SIPA because CDC was not registered with the SEC pursuant to the Securities Act of 1933. CR 34, Exhibit J, at 1; see 15 U.S.C. § mil (14).
Second, McMurray attempted to purchase 400 shares of IBM stock for $25,-000. CR 32, Attachment (Claims of Mina Kolb McMurray), at 1. She made out her check to “C.J. Delahunty/Pacific Bank,” upon Delahunty’s instructions. It was subsequently endorsed by Delahunty, but she never saw the shares. The SIPC denied her claim for the IBM shares, but paid her $25,000 because she had turned over her cash to Delahunty in his capacity as an officer of Brentwood. CR 33, at 2. The BAP determined that this $25,000 payment should be considered a claim for securities rather than a claim for cash. The distinction is important because the SIPA provides maximum coverage of $100,000 for cash claims. 15 U.S.C. § 78fff-3(a)(l). If McMurray had already received $25,000 on a cash claim, she would have been limited to $75,000 on all other claims. The BAP, however, was correct; McMurray was claiming her shares. The fact that the trustee did not have them and had to satisfy the claim with cash did not alter the nature of her claim.
C. The Birmingham Claim
Birmingham was a long-time acquaintance and client of Delahunty. CR 44, at 6-9. He had an account with Dela-hunty’s former firm, Delahunty & Rezin. He originally placed $18,000 in this account by making out a check payable to Delahunty & Rezin. CR 41, at 13. Delahunty was to invest it as he saw fit. Delahunty later told him that his account had increased to $20,000 and suggested that he use this money to buy 20,000 shares of AMR. Birmingham claims that Delahunty did not disclose his relationship with AMR. Birmingham gave him permission to purchase the shares. He later authorized Delahunty to buy 10,000 additional shares of AMR. He paid for them by obtaining a cashier’s check for $10,000 payable to himself, endorsing it in blank, and handing it to Dela-hunty, per Delahunty’s instructions. He never received confirmation of these purchases or stock certificates, but Delahunty told him that he had 30,000 shares of AMR stock in his account at the time the account was transferred to Brentwood Securities.
We agree with the BAP that Birmingham was a customer of Brentwood. Birmingham had deposited cash[6] with Dela- *330 hunty & Rezin for the purpose of buying certain securities. This cash went directly to the broker; it did not go to AMR or any other third party. When his account was transferred to Brentwood, Birmingham had a claim for the securities or, in the alternative, for the cash he had deposited. He fits squarely within the definition of customer, and the BAP properly upheld the bankruptcy court’s order.
Conclusion
Every market has its dreamers and its crooks. Occasionally, they are one and the same. The SIPA protects investors when a broker holding their assets becomes insolvent. It does not comprehensively protect investors from the risk that some deals will go bad or that some securities issuers will behave dishonestly. Claimants who cannot show that they entrusted their cash or securities to Brentwood have no remedy under the SIPA.
The judgment of the Bankruptcy Appellate Panel is AFFIRMED in part and REVERSED in part. The case is remanded for proceedings consistent with this opinion.

. The Appendix to Appellant’s Brief to the Bankruptcy Appellate Panel is a compilation of all of the documents relevant to this appeal. It is item 15 of the BAP clerk’s record, but will simply be referred to as "CR.”

. Comstock Mining was a highly speculative, somewhat exotic, investment. The company planned to engage in mining, natural resources development and energy research. Among other things, it hoped to mine precious metals and diamonds in various parts of the world and develop applications for the Piezo theory of electricity. CR 34, Exhibit M (Prospectus of Comstock Mining), at 3.

. Brentwood could only have come into possession of the funds by forging Comstock's endorsement. Aside from the fact that claimants would have been entitled to recover against the bank had it paid out on forged endorsements, UCC § 4-401(1), there were no such forgeries here. The checks were cashed by Comstock, to whom they were made out; the funds never passed through Brentwood's accounts.

. Because Brentwood and Comstock were not totally unrelated entities, it is conceivable that funds held by Comstock could be attributed to Brentwood under some alter ego or agency theory. No claimant pressed such a theory before us; the BAP did not rely on this rationale.

.AMR was also a highly speculative investment. It was the lessee for some of Comstock’s properties, including one that preliminary evidence indicated might contain tungsten and other minerals. CR 34, Exhibit M (Prospectus of Comstock Mining), at 14.

. The original $ 18,000 paid by a check made out to the broker was the equivalent of cash insofar as Brentwood was concerned; the additional 110,000 was converted to bearer paper, a cash equivalent, when Birmingham endorsed the cashier’s check and handed it to Delahunty.