[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 23, 2000
THOMAS K. KAHN
CLERK

----------------------
No. 99-2510
----------------------
D. C. Docket No. 98-01661-CIV-T-17E

In Re: OLD NAPLES SECURITIES, INC.,

Debtor.

------------------------

THEODORE H. FOCHT,
SECURITIES INVESTOR PROTECTION CORP.,

Plaintiffs-Appellants,

versus

KEVIN HEEBNER,
EILEEN C. BROWN,
MERRITT W. BROWN,

Defendants-Appellees.

------------------------
Appeal from the United States District Court
for the Middle District of Florida
------------------------
**(August 23, 2000)**

Before BLACK, CARNES and KRAVITCH, Circuit Judges.

KRAVITCH, Circuit Judge:

In this appeal, we determine whether clients of an insolvent brokerage qualify as "customers" under the Securities Investor Protection Act ("SIPA" or "the Act"), 15 U.S.C. §§ 78aaa-78*lll*, entitling them to funds from the brokerage's estate and, if necessary, the Securities Investor Protection Corporation ("SIPC"). The bankruptcy and district court each concluded that the clients had deposited cash with Old Naples Securities for the purpose of investing in securities, and were therefore "customers" entitled to the protection of SIPA when the court-appointed Trustee liquidated the brokerage's assets. Discerning no clear error in the district court's findings of fact, and based upon our legal analysis, we affirm the district court and hold that the clients were customers of Old Naples Securities.

I. Background and Procedural History

Old Naples Securities was a securities broker-dealer, a member of the SIPC and registered with the SEC. Specifically, Old Naples Securities was an "introducing broker"; a separate clearing broker, Howe Barnes, carried and maintained the accounts of Old Naples Securities' clients. Old Naples Securities was based in Naples, Florida, with branch offices in Wyomissing and Bethlehem, Pennsylvania. James Zimmerman was the sole shareholder and principal of Old

2

Naples Securities. He was also the owner and principal of Old Naples Financial

Services,[1] a separate company that was not a securities brokerage. Daniel Shaffer

ran the Wyomissing office, and all of the claimants in this case were his clients.

From the time Zimmerman bought Old Naples Securities in 1992, the

brokerage was in financial difficulty. Increasingly desperate to pay outstanding

debts and to cover other obligations, Zimmerman began what, in effect, was a

"Ponzi scheme." In 1995 and 1996, Zimmerman raised money from investors in

Florida and repeatedly asked his Pennsylvania branch managers to raise funds from

their clients. Zimmerman used some of these contributions to pay Old Naples

Securities' expenses, and he diverted some of the funds for his personal use. He

used other contributions to pay back the principal and interest owed to earlier

investors. By the summer of 1996, Zimmerman was unable to cover substantial

payments owed to his Pennsylvania brokers and their investors.

Congress passed SIPA in 1970 for just this situation: to protect investors

when their brokerages fail. The statute established the SIPC to maintain a fund for

investor protection, oversee the liquidation of brokerages in a manner similar to

bankruptcy proceedings, and, under certain circumstances, reimburse customers of

a failed brokerage . See Securities Investor Protection Corp. v. Pepperdine Univ.

_____

[1] Also referred to in the record as *Olde* Naples Financial Services (emphasis added).

3

(*In re* Brentwood Sec., Inc.), 925 F.2d 325, 327 (9th Cir. 1991); SEC v.

Ambassador Church Fin./Dev. Group, Inc., 679 F.2d 608, 609-10 (6th Cir. 1982).

On August 29, 1996, the SIPC filed an application in the United States District

Court seeking a protective order against Old Naples Securities. The court found

that the brokerage's customers needed the protection afforded by SIPA, appointed

Focht as Trustee to liquidate Old Naples Securities' assets, and removed the case to

bankruptcy court.

SIPA permits "customers," as defined by the Act, to file claims with the

Trustee for any outstanding obligations by the brokerage. "Customers" include

those who have entrusted securities to the brokerage in the ordinary course of its

business and those who have deposited cash with the brokerage for the purpose of

purchasing securities.[2] The Trustee determines whether a claim is covered by

SIPA and should be paid; claimants can then file an objection to the Trustee's

determination in the bankruptcy court. That is what happened in this case.

Kevin Heebner, Eileen Brown, and her son Merritt Brown, III, filed claims

for losses resulting from their unwitting participation in Zimmerman's Ponzi

---

[2]    The term "customer" of a debtor means any person . . . who has a claim on
account of securities received, acquired, or held by the debtor in the ordinary
course of its business as a broker or dealer . . . .  The term "customer" includes . . .
any person who has deposited cash with the debtor for the purpose of purchasing
securities . . . .

15 U.S.C. § 78*lll*(2) (2000).

scheme. In December 1995, Shaffer had convinced Heebner to invest $50,000 for one month with a return of ten percent. As promised, Heebner received a check for $55,000 in January 1996. Shaffer repeated the offer the next month, and Heebner invested $80,000. Approximately a month later, Heebner recouped his $80,000 investment and $8,000 in interest. In April, Shaffer presented Heebner with an opportunity to invest $100,000 for three months with an annualized return of eighteen percent. Heebner did so, and "rolled over" the investment for an additional three months at an interest rate of twenty-four percent annualized. In August 1996, however, Heebner learned that Zimmerman had misappropriated his money, and he subsequently filed a claim with the Trustee for $100,000.

The Brown family had a similar experience. Beginning in July 1995, Merritt Brown, Jr., invested increasing amounts of money at Shaffer's behest in the name of his wife, Eileen Brown. Weeks after each investment, funds representing the principal and interest were deposited in Eileen Brown's account with Howe Barnes. Contacted by Shaffer in January 1996, Merritt Brown, Jr., invested $500,000 on behalf of his wife; three months later he invested $110,000 on behalf of his son, Merritt Brown, III. Eileen and Merritt Brown, III, received interest payments over the course of the summer, but in August Shaffer informed the Browns that Zimmerman had stolen their money.

5

According to Heebner and the Browns, Shaffer had told them Zimmerman would use their money to buy bonds, and they understood that the bonds would be purchased in their names. According to Merritt Brown, Jr., Shaffer explained that Zimmerman had opportunities to purchase discounted bonds and resell them quickly at near face value. Shaffer, however, never identified the specific bonds that Heebner and the Browns supposedly were purchasing.

Shaffer presented these investment opportunities in his capacity as an Old Naples Securities broker, and Heebner and Merritt Brown, Jr., claim they thought the investments would be purchased through Old Naples Securities. Merritt Brown, Jr., made the investment on behalf of his son through a check payable to Old Naples Securities, but pursuant to Shaffer's instructions, Heebner and Eileen Brown's investments were made by way of a wire transfer to Old Naples Financial Services. All of the claimants received monthly statements from Old Naples Financial Services showing the amount invested and an interest rate of twenty-four percent. Merritt Brown, Jr., also received a letter in February 1996 from Zimmerman on Old Naples Securities letterhead which stated:

> This letter is notification that all money loaned to Olde Naples Financial Services, Inc. and Old Naples Securities, Inc. will be held in an escrow account. The money will only be used as [an] escrow fund to raise net

capital in the firm and I will guarantee this as owner of the company.[3] Merritt Brown, Jr., claims that he spoke with Shaffer about the letter, and that Shaffer assured him that his money was used to buy bonds, that the investment was insured, and that Brown owned the bonds and would be able to obtain the paper certificates.

The Trustee denied the claims of Heebner and the Browns on the ground that they did not qualify as "customers" under SIPA. The bankruptcy court disagreed, concluding that the claimants had deposited funds with Old Naples Securities for the purchase of securities.[4] The district court summarized the bankruptcy court's factual findings as follows: (1) neither Heebner nor Merritt Brown, Jr., had any reason to know that they were not dealing directly with the debtor brokerage when they wired funds to Old Naples Financial Services; (2) the claimants entrusted money for the purpose of purchasing bonds of some sort; (3) these transactions had the characteristics, at least from the claimants' perspective, of a typical fiduciary relationship between a broker and client; and (4) the claimants had no intention of

---

[3] Trustee's Ex. 13.

[4] The bankruptcy court determined that Heebner had a valid claim for cash in the amount of $87,000; Eileen Brown had a valid claim for cash in the amount of $335,000; and Merritt Brown, III, had a valid cash claim for $103,400. Order on Objections to Trustee's Determinations of Claims at 13, in R1, Tab 1.

7

lending money to Zimmerman or his corporations.[5]  Admittedly, some statements

in the bankruptcy court's order are in tension with those findings.  For example,

the court stated in its order that the investments "could be seen as a joint venture

because Zimmerman and the Claimants were to share the profit."[6] Nonetheless, the

district court affirmed the bankruptcy court's order.  Focht and the SIPC now

appeal.

II. Discussion

Focht and the SIPC argue that, for the purpose of their claims, neither

Heebner nor the Browns qualify as "customers" within the meaning of SIPA for

three reasons.  First, Heebner and Eileen Brown (through her husband) wired funds

to Old Naples Financial Services rather than Old Naples Securities, the debtor

brokerage.  Second, Focht and the SIPC contend that claimants' investments were

not in "securities" as defined by SIPA; as Appellants characterize it, Heebner and

the Browns either lent money to Zimmerman or participated in an investment fund.

Finally, Focht and the SIPC claim that because the investments promised such a

---

[5] See Order on Appeal at 3-4, in R1, Tab 18.

[6] Order on Objections to Trustee's Determinations of Claims at 7, in R1, Tab 1.  Similarly, the court stated that "[t]he 'plan' was that Zimmerman would purchase bonds at a discount, which he would later sell and then split the profit with the investor."  Id. at 5.

8

high return and were so poorly documented, they cannot be considered within Old

Naples Securities' "ordinary course of business" and therefore cannot form the

basis of a SIPA customer claim. We consider each of these arguments in turn.[7]

We review the bankruptcy court's factual findings for clear error, Green

Tree Acceptance, Inc. v. Calvert (*In re* Calvert), 907 F.2d 1069, 1071 (11th Cir.

1991), but whether or not the facts establish that Heebner and the Browns were

customers of Old Naples Securities in regard to their claims is a question of law

that we review *de novo*, see Securities Investor Protection Corp. v. Wise (*In re*

Stalvey & Assocs.), 750 F.2d 464, 468 (5th Cir. 1985).


A.  Did Heebner and Eileen Brown "Deposit Cash with the Debtor"?

A claimant is only a "customer" protected by SIPA in regard to a claim for

---

[7] Claimants also contend that this appeal was untimely filed. We consider this issue briefly as part of our ongoing responsibility to ensure our jurisdiction over an appeal. Focht and the SIPC mistakenly filed notice of their appeal with the clerk's office for the *bankruptcy* court in the Middle District of Florida; the notice did not reach the district court clerk until March 16, 1999, one day after the standard thirty day period for filing an appeal had expired. See Fed. R. App. P. 4(a)(1). Focht and the SIPC immediately moved the district court for either a finding that the appeal had been timely filed or for an extension of time to file the appeal on the ground of excusable neglect. See Fed. R. App. P. 4(a)(5)(A). The court granted the motion, and we review orders granting additional time for appeal for abuse of discretion. See Advanced Estimating Sys., Inc. v. Riney, 77 F.3d 1322, 1325 (11th Cir. 1996). Given that Focht and the SIPC initially filed their appeal (albeit in the wrong court) within the thirty days allowed by Rule 4(a)(1), that the district court received the notice of appeal only one day late, and that the misfiling apparently resulted from clerical error, we conclude that any neglect on Appellants' part was excusable. See id. (listing the factors a court should consider when determining whether a party's neglect in filing an appeal within thirty days was "excusable").

9

cash entrusted to a brokerage if he or she "deposited [the] cash *with the debtor*."

15 U.S.C. § 78*lll*(2) (emphasis added). Focht and the SIPC argue that because

Heebner and Eileen Brown wired funds to Old Naples Financial Services rather

than Old Naples Securities, they do not qualify.[8] Whether a claimant "deposited

cash with the debtor," however, does not (as Focht and the SIPC suggest) depend

simply on to whom the claimant handed her cash or made her check payable, or

even where the funds were initially deposited. Instead, the question is whether

there was "actual receipt, acquisition or possession of the property of a claimant by

the brokerage firm under liquidation." In re Stalvey, 750 F.2d at 469 (quoting SEC

v. Kenneth Bove & Co., 378 F. Supp. 697, 700 (S.D.N.Y. 1974)). Thus, courts

have held that a claimant who delivered a note payable to a broker personally,

rather than to the brokerage, could qualify as a "customer" protected by SIPA, see

Ravis v. Day (*In re* Investors Sec. Corp.), 6 B.R. 420, 423, 425 (Bankr. W.D. Pa.

1980), and that the statute covered claimants when one brokerage (which later

became insolvent) misused their funds held in accounts with another firm, see *In re*

First State Sec. Corp., 34 B.R. 492, 495-96 (Bankr. S.D. Fla. 1983).

---

[8] Heebner and Eileen Brown argue that the bankruptcy court's conclusion that they deposited funds with Old Naples Securities is a factual finding, reviewed only for clear error. We agree with Focht and the SIPC, however, that this is a legal rather than factual conclusion, for the bankruptcy court only reached it by first determining that Old Naples Securities and Old Naples Financial Services should be viewed as a single entity for the purpose of this litigation.

Claimants who invest with a broker in his individual capacity, rather than as an agent of the brokerage, are not protected by SIPA. See SEC v. First Sec. of Chicago, 507 F.2d 417, 422 (7th Cir. 1974). Similarly, claimants who invest directly in a company, bypassing the brokerage altogether, are not protected by SIPA even if their broker first suggested the investment. See In re Brentwood Sec., 925 F.2d at 328-29. On the other hand, SIPA protects claimants who attempt to invest through their brokerage but are defrauded by dishonest brokers. See id. at 329-30; Securities Investor Protection Corp. v. Waddell Jenmar Sec., Inc. (In re Waddell Jenmar Sec., Inc.), 126 B.R. 935, 938-39, 942, 946 (Bankr. E.D.N.C. 1991); cf. In re Gibralco, Inc., 53 B.R. 324, 329 (Bankr. C.D. Cal. 1985) ("The trusting customer is not to be penalized for choosing a careless, unethical or dishonest broker. The primary purpose of the Act is to assure the unsophisticated participant in securities transactions that there is protection when a bad choice of brokers is made.") (quoting Ambassador Church, 679 F.2d at 614). If an investor intended to have the brokerage purchase securities on her behalf and reasonably followed the broker's instructions regarding payment, she can be considered a "customer" under SIPA if the brokerage or its agents then misappropriate the funds. See In re Brentwood Sec., 925 F.2d at 329-30; First Sec. Co. of Chicago, 507 F.2d at 421-22; In re Waddell Jenmar Sec., Inc., 126 B.R. at 938-39.

11

In this case, the bankruptcy court noted that "Claimants had no reason to know that they were not dealing with the Debtor,"[9] and this finding was not in error. Shaffer acted as the agent of Old Naples Securities when he brought the bond opportunity to the attention of Merritt Brown, Jr., and Heebner, and Shaffer represented that the bonds would be purchased through Old Naples Securities.[10] Claimants followed his instructions for payment. Heebner and the Browns had had no dealings with Old Naples Financial Services prior to the investments underlying this litigation, and they had never heard of the company. Heebner did not notice that the wire instructions were for an entity other than Old Naples Securities, and he believed that he was sending money to the brokerage.[11] Merritt Brown, Jr., did notice, but when he inquired about the discrepancy, Shaffer assured him that Old Naples Securities and Old Naples Financial Services were one and the same.[12] The letter Zimmerman sent to Merritt Brown, Jr., was on Old Naples Securities letterhead; it referred to money given to the brokerage and Old Naples

_____

[9] Order on Objections to Trustee's Determinations of Claims at 8, in R1, Tab 1.

[10] See Final Evidentiary Hr'g (Dec. 9, 1997) at 20, 25, 29, 38-39, in R1, Tab 1. Even Shaffer's business card stated, "Securities by licensed individuals offered through Old Naples Securities, Inc." R, Claimants' Ex. 1.

[11] See id. at 38.

[12] See id. at 114. Shaffer corroborated Brown's testimony, acknowledging that he believed and told his investors that Old Naples Securities and Old Naples Financial Services were a single entity. See Shaffer Dep. at 40-42, in Trustee's Ex. 10.

Financial Services to be used by "the firm."[13]

It is also clear that Heebner and Eileen Brown's funds, although initially deposited with Old Naples Financial Services, were used by, or at least for, Old Naples Securities. Zimmerman testified that he diverted some of the investors' money from Old Naples Financial Services for personal use, and he used much of the money to pay Old Naples Securities' expenses.[14] There is ample evidence in the record of checks, drawn from the account to which Heebner and Eileen Brown wired their funds, issued to Old Naples Securities and also to cover the brokerage's obligations.[15] Given this evidence, we are satisfied that the debtor brokerage acquired control over all of the claimants' funds.[16]

B. Did the Claimants Deposit Their Cash "for the Purpose of Purchasing Securities"?

---

[13] See R, Trustee's Ex. 13.

[14] See Sworn Statement of Zimmerman at 139-40, 313-16 in Claimants' Ex. 6.

[15] See id. at 130-84.

[16] The parties contest whether the "alter ego" theory applies in SIPA proceedings, that is, whether the court can consider funds held by Old Naples Financial Services to be in the possession of Old Naples Securities because the companies are in effect a single entity. We need not dwell on whether Old Naples Financial Services' assets in general are deemed to belong to Old Naples Securities, however, because, as the text makes clear, the funds of the individual claimants in this case were used by the owner of Old Naples Securities for the benefit of Old Naples Securities.

13

Claimants who have deposited cash with the debtor brokerage qualify as "customers" under SIPA only if they entrusted the funds "for the purpose of purchasing securities." 15 U.S.C. § 78*lll*(2). Whether the investment was to be made in a "security" is a matter of law, because SIPA provides a definition of the term. See 15 U.S.C. § 78*lll*(14).

When a claimant entrusts cash with a brokerage, and the broker misappropriates the money, courts must determine whether the intended investment as understood by the claimant would have been in a "security" as defined by SIPA.[17] See, e.g., Securities Investor Protection Corp. v. C.J. Wright & Co. (*In re* C.J. Wright & Co.), 162 B.R. 597, 605-06 (Bankr. M.D. Fla. 1993); *In re* Investors Sec. Corp., 6 B.R. at 425-26.

According to Focht and the SIPC, the investment opportunity presented to the claimants by Shaffer was for Zimmerman to buy bonds in his own name, sharing profits with the investors. In this view, the claimants were not buying

---

[17] By contrast, if claimants entrusted securities to the brokerage, courts can discern whether SIPA provides coverage from the actual characteristics of those securities and the arrangement with the brokerage. See, e.g., *In re* Brittenum & Assocs., Inc., 82 B.R. 64, 65, 68 (Bankr. E.D. Ark. 1987). It also is possible to look at the arrangement objectively if claimants entrusted cash with a brokerage and the money was not misappropriated. Typically in this scenario, either (1) the broker actually purchased an investment for the claimant, in which case there was no longer a SIPA claim for cash, see, e.g., *In re* Omni Mut., Inc., 193 B.R. 678, 681 (S.D.N.Y. 1996), or (2) the deposit of cash was for some purpose other than purchasing securities for the claimant, and no fiduciary relationship was established, see, e.g., Tew v. Resource Management (*In re* ESM Gov't Sec., Inc.), 812 F.2d 1374, 1376-77 (11th Cir. 1987).

14

bonds, but participating in an unregistered "investment plan" or lending money to Zimmerman, neither of which falls within SIPA's definition of covered securities.[18] Focht and the SIPC point out that the investments were to pay a fixed rate of interest, that the claimants knew Zimmerman would be the one actually buying the bonds, and that the claimants did not know in which bonds they supposedly were investing.

The bankruptcy court disagreed with this characterization and made a factual finding that "the Claimants wired the funds with the intent that the funds be used for the purchase of discount bonds of some sort."[19]  It is not surprising that Zimmerman would be the one purchasing the bonds, because he was a registered broker, and he was the one with the special opportunity to purchase discounted bonds that could quickly be resold at near face value.  There is ample evidence that the claimants believed Zimmerman would buy the bonds in their names and for

---

[18] An "investment contract or certificate of interest or participation in any profit-sharing agreement" only falls within SIPA's definition of securities "if such investment contract or interest is the subject of a registration statement with the Commission pursuant to the provisions of the Securities Act of 1933."  15 U.S.C. § 78*lll*(14).  Cash that is simply lent to the brokerage cannot form the basis of a SIPA customer claim because the statute's definition of "customer" excludes individuals whose claims are for "cash . . . which . . . is part of the capital of the debtor." 15 U.S.C. § 78*lll*(2)(B).  Case law has established that individuals must have a fiduciary relationship, rather than a creditor-debtor arrangement, with their brokerage to state a claim under SIPA.  See Tew v. Resource Management (*In re* ESM Gov't Sec., Inc.), 812 F.2d 1374, 1376 (11th Cir. 1987); SEC v. F.O. Baroff Co., 497 F.2d 280, 283-84 (2d Cir. 1974).

[19] Order on Objections to Trustee's Determinations of Claims at 10, in R1, Tab 1.

15

their individual accounts.[20]  It is true that a fixed rate of return is often associated with loans, but the bankruptcy court noted that it is often characteristic of bonds as well.[21]  Finally, other courts have concluded that when a claimant deposits cash with his brokerage to make an investment, SIPA provides protection even if the claimant does not identify specific securities for his broker to purchase.  See Ravis v. Caretti (*In re* Investors Sec. Corp.), 30 B.R. 214, 219 (Bankr. W.D. Pa. 1983); see also *In re* C.J. Wright & Co., 162 B.R. at 606, 608-09 (claimants who invested in debtor brokerage's "Money Market Club" and "Deposit Account," and who thought their funds would be used to purchase unnamed certificates of deposit, are entitled to customer status under SIPA).

Investors, of course, must have had *some* notion of what they wanted their funds used for; a deposit of funds with only the vaguest instructions to make "stock market investments" would not qualify as a deposit "for the purpose of purchasing securities."  See *In re* Waddell Jenmar Sec., Inc., 126 B.R. at 947.  Moreover, although "lack of diligence" does not defeat a claim under SIPA, *In re* Gibralco, 53 B.R. at 328-29 (citing Ambassador Church, 679 F.2d at 614),[22] willful ignorance

---

[20] See Final Evidentiary Hr'g at 36, 38-39, 137, 146, in R1, Tab 1.

[21] See Order on Objections to Trustee's Determination of Claims at 10, in R1, Tab 1, Docket Entry 165.

[22] See also *In re* C.J. Wright & Co., 167 B.R. at 607.

16

on the claimant's part in the face of clear indications that an investment scheme is suspect may preclude a finding that the claimant intended to purchase "securities" covered by the Act.

Claimants in this case could have been more diligent when presented with an opportunity promising a high return and requiring an immediate investment; they could have demanded more information and more thorough documentation of their investments. Nonetheless, having considered the claimants' testimony concerning their understanding of the investments at issue here, the testimony of Zimmerman and Shaffer about their explanation of the investment opportunity, and the documentary record evidence, we can find no error in the bankruptcy court's finding that claimants reasonably believed they were buying bonds. Because SIPA's definition of "securities" includes bonds, see 15 U.S.C. § 78*lll*(14), we conclude that claimants did deposit their funds with Old Naples Securities for the purpose of purchasing securities.

C. Did the Claimants Deposit Their Cash "in the Normal Course of Business" with Old Naples Securities?

Finally, Focht and the SIPC argue that the claimants are not "customers" as defined by SIPA because the investments at issue in this case were so unusual, they

cannot be considered a part of Old Naples Securities' "ordinary course of business" as a brokerage. Focht and the SIPC base this argument on the first sentence of SIPA's definition of "customer," which states in pertinent part that "[t]he term 'customer' of a debtor means any person . . . who has a claim on account of securities received, acquired, or held by the debtor *in the ordinary course of its business as a broker or dealer . . . .*" 15 U.S.C. § 78*lll*(2) (emphasis added).

The claims in this case, however, are not based on securities held by Old Naples Securities. Heebner and the Browns assert claims for cash based on the second sentence of § 78*lll*(2), which covers "any person who has deposited cash with the debtor for the purpose of purchasing securities." This sentence does not include the "ordinary course of business" qualification. When interpreting a statute, we look first to the plain meaning of its language, see United States v. Gonzalez, 520 U.S. 1, 4-6, 117 S. Ct. 1032, 1034-35 (1997), and "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion," see Russello v. United States, 464 U.S. 16, 23, 104 S. Ct. 296, 300 (1983) (quoting United States v. Wong Kim Bo, 472 F.2d 720, 722 (5th Cir. 1972)) (per curiam). In this regard, § 78*lll*(2) is clear: the definition of "customers" pertaining to claims for cash

18

deposited with a brokerage does not require a special showing that a claimant entrusted funds within the ordinary course of the brokerage's business.

Such a requirement would be largely superfluous. As discussed above, deposits of cash must be for the purchase of traditional security instruments. SIPA's thorough definition of "securities" includes more flexible and amorphous investments, such as profit-sharing agreements, only if they are registered with the SEC. See 15 U.S.C. § 78*lll*(14). SIPA also disallows claims based on transactions with foreign subsidiaries of any SIPC member brokerage and claims for cash or securities that form a part of the brokerage's capital. See 15 U.S.C. §§ 78*lll*(2)(A) & (B). Finally, courts have held that SIPA only provides claimants with protection for transactions with indicia of a fiduciary relationship. See Tew v. Resource Management (*In re* ESM Gov't Sec., Inc.), 812 F.2d 1374, 1376 (11th Cir. 1987); SEC v. F.O. Baroff Co., 497 F.2d 280, 283-84 (2d Cir. 1974). These restrictions help ensure that SIPA protects only claimants who sought legitimate brokerage services.

Focht and the SIPC acknowledge that no court has disallowed a claim under SIPA on the grounds that the underlying transaction was not in the brokerage's ordinary course of business, and no court has applied the requirement to claims for cash. We decline to be the first.

III. CONCLUSION

We AFFIRM the district court order allowing the claims of Kevin Heebner, Eileen Brown, and Merritt Brown, III, in the Old Naples Securities SIPA liquidation proceedings.