**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUL 3 2002**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

In re: PRIMELINE SECURITIES
CORPORATION,

     Debtor.

FARUK AHAMMED, SAEED
CHEEMA, GEETA CHOSKI,
MOHAMMED SAIFUL ISLAM,
RABIUL KARIM, SAEED MANSOURI,
MOHAMMAD H. MIAH, MUHAMMED
FAROOQ MIAN, MOHAMMAD
HASIBUR RAHIM, MUHAMMAD
SHARIFUR RAHMAN, MAHENDRA
A. RATHI, SUBHASH SHAH and
SHAHID UZZAMAN,

     Appellants,

v.

SECURITIES INVESTOR
PROTECTION CORPORATION and
LINDA S. PARKS, TRUSTEE for
PRIMELINE SECURITIES
CORPORATION,

     Appellees.

No. 00-3214

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**(D.C. No. 99-CV-1429)**

---

Alexander B. Mitchell, II (J. Michael Morris with him on the briefs), Klenda, Mitchell, Austerman & Zuercher, L.L.C., Wichita, Kansas, for Appellants.

Kenneth J. Caputo, Associate General Counsel and Senior Trial Counsel, Securities Investor Protection Corporation, Washington, D.C. (Linda S. Parks and Art C. Chalmers of Kahrs, Nelson, Fanning, Hite & Kellogg, L.L.P., Wichita, Kansas; and Stephen P. Harbeck, General Counsel, Securities Investor Protection Corporation, Washington, D.C., with him on the briefs), for Appellees.

---

Before **TACHA**, Chief Judge, **BALDOCK**, and **LUCERO**, Circuit Judges.

---

**BALDOCK**, Circuit Judge.

---

Appellants, thirteen individual claimants in the liquidation proceeding of a failed broker-dealer (collectively, "Claimants"), seek protection under the Securities Investor Protection Act (SIPA) and payment of their claims from the insurance fund established by the Securities Investor Protection Corporation (SIPC).

## I.

The debtor, Primeline Securities Corporation ("Primeline"), was a licensed securities broker-dealer registered with the Securities Exchange Commission and a member of SIPC.[1]  Claimants' claims in the liquidation proceeding are based upon financial transactions with Asif Ameen, a registered broker employed by Primeline.

---

[1]  Primeline was an introducing broker.  As such, it was not permitted to hold funds or securities for customers, and was not authorized to carry customer accounts. Primeline cleared all client securities transactions through a clearing broker on a fully disclosed basis.  All checks for investments through Primeline were to be made payable to Primeline's clearing broker, Rauscher Pierce Refnes, Inc.

While employed by Primeline, Ameen operated a "ponzi" scheme inducing Claimants and others to invest funds in fraudulent "investment opportunities."[2]

Ameen and each of the Claimants are from foreign countries, generally in South Asia. Ameen was extremely active in the South Asian community in Wichita, Kansas. He regularly assisted members of the community with various personal and financial transactions, including the transfer of assets from South Asia where stringent financial controls often restrict transfers to the United States. Ameen also had a reputation for locating investment opportunities with high rates of return. Although many of the Claimants were long-time residents of the United States, they had little or no experience investing in the United States securities markets. Because of Ameen's involvement and reputation in the community, Claimants entrusted their funds to Ameen and relied on his investment advice.

Ameen offered most participants in his scheme an opportunity to pool their funds with other investors to make a higher rate of return than they could achieve with an individual investment. The "pooled investment" provided a fixed rate of return over a specified period of time. Ameen offered such participants a rate of return as high as

---

[2] The term "ponzi scheme" refers to an investment scheme whereby returns to investors are financed, not through the success of an underlying business venture, but from the principal sums of newly attracted investors. See Hill v. Kinzler (In re Foster), 275 F.3d 924, 926 (10th Cir. 2001). Typically, investors are promised large returns for their investments. Initial investors are actually paid the promised returns, attracting additional investors.

3

seven to ten percent per month (84% - 120% per annum).  Other investors purchased

"debentures" in fictitious corporations.  Ameen touted the debentures as a low risk

investment option.   The debentures offered a more modest return, between twelve and

fifteen percent per annum.  In conjunction with the fraud schemes, Ameen and his wife

maintained a number of bank accounts in various company or trade names.[3]  Ameen

typically instructed participants to make checks out to one of the trade name accounts and

deposited the funds received directly into the account.[4]  None of the funds at issue were

deposited with Primeline or its clearing broker.  Most of the funds were diverted for

Ameen's personal use.

When Ameen's scheme collapsed, investor claims and the actions of the Kansas

Securities Commissioner prompted SIPC to seek protection for Primeline customers

pursuant to SIPA.  See 15 U.S.C. §§ 78eee(a)(3) and (b)(1)(A).  On January 9, 1998, the

district court entered a protective order against Primeline.  The order appointed a trustee

and removed the proceeding to the bankruptcy court for the liquidation of Primeline's

---

[3]  Ameen and/or his wife held accounts under the following names: Ramesh
Products Resources, William Control Co., Cambras Communications Corp., Discovery
Distributing Corp., Stateside Resources, Corp., Roxbury Corp., Cobra Electronics, Corp.,
SST Marketing, Inc., Brighton Information Services, Payfone Systems Corp., Can Alaska
Corp., Epitope Discovery Systems, ELF Associates Corp., and World Tradelink.  It is
unclear from the parties' stipulations whether Ameen actually formed the companies
named in the accounts.  Ameen also had a company in which he did conduct business,
Shipping Express King Copies, Inc.  Ameen also deposited participant funds in the
Shipping Express bank account.

[4]  Occasionally, Ameen also instructed the participant to make a check payable
directly to Ameen or to another investor.

4

assets.  See id. §§ 78eee(b)(1)(3) and (4).

In the liquidation proceeding, the Trustee denied claims for funds Claimants deposited with Ameen for investment in his fraudulent investment opportunities, asserting such claims were not covered under SIPA.[5]  Claimants filed oppositions to the denial of their claims with the bankruptcy court, and the matter was the subject of an evidentiary hearing.  At the hearing, Claimants testified they believed they were investing with, through, or in Primeline.  Ameen generally met with potential clients at Primeline's offices and requested new investors complete Primeline New Account forms.  The Claimants followed Ameen's instructions in delivering funds for investment.  In some cases, Ameen also delivered fraudulent statements on Primeline letterhead confirming the investment or reflecting the promised return.

Based on this evidence, the bankruptcy court entered a memorandum order concluding Claimants were "customers" as defined by SIPA and entitled to SIPC payments.  The Trustee and SIPC sought and received leave to file an interlocutory appeal.  The district court reversed, finding Claimants were not "customers" as defined by SIPA because (1) Claimants did not entrust funds "with the debtor" as required under the

---

[5]  Ameen had many clients, including some of the Claimants, for whom he placed legitimate securities transactions through Primeline and its clearing broker.  The Trustee honored claims where the funds were actually delivered to Primeline.  The Trustee also honored claims for funds Ameen transferred from Primeline accounts without the account owner's consent, and claims where investors made their checks payable to "RPR," but Ameen deposited the funds in one of his own accounts, Ramesh Product Resources, rather than in the account of Primeline's clearing broker, Rauscher Pierce Refnes.

Act, and (2) the interests Claimants sought to purchase were not "securities" protected under the Act. Claimants filed a timely appeal with this Court. We have jurisdiction pursuant to 28 U.S.C. § 158(d).[6] We affirm in part, reverse in part, and remand for further proceedings.

## II.

Where a district court acts in its capacity as a bankruptcy appellate court, we review the bankruptcy court's decision independently. See Eastland Mortgage Co. v. Hart (In re Hart), 923 F.2d 1410, 1416 (10th Cir. 1991). We review the bankruptcy court's factual findings for clear error. See Homestead Golf Club, Inc. v. Pride Stables, 224 F.3d 1195, 1199 (10th Cir. 2000). We review de novo the bankruptcy court's legal conclusions. Id. Whether the facts establish Claimants were customers of Primeline with respect to the claims at issue is a legal question we review de novo. Focht v. Heebner (In re Old Naples Sec., Inc.), 223 F.3d 1296, 1302 (11th Cir. 2000).

## A.

Congress passed SIPA to protect public investors against financial losses arising from the insolvency of registered brokers and dealers. See Securities Investor Protection Corp. v. Barbour, 421 U.S. 412, 415 (1975). The statutory scheme facilitates the return of

---

[6] Although the appeal to the district court was interlocutory, the district court's decision effects a final disposition of the claims. In a bankruptcy proceeding, an order is final and appealable if it disposes of a particular adversary proceeding or a discrete controversy. See Adelman v. Fourth Nat'l Bank and Trust Co., 893 F.2d 264, 266 (10th Cir. 1990). The district court decision is thus final for purposes of 28 U.S.C. § 158(d).

customer property held by the insolvent firm and reimburses customers for cash and securities mishandled or misappropriated by the brokerage firm or its agents. As the Supreme Court explained:

> Customers of failed firms found their cash and securities on deposit either dissipated or tied up in lengthy bankruptcy proceedings. In addition to its disastrous effects on customer assets and investor confidence, this situation also threatened a "domino effect" involving otherwise solvent brokers that had substantial open transactions with the firm that failed. Congress enacted the SIPA to arrest this process, restore investor confidence in the capital markets, and upgrade the financial responsibility requirements for registered brokers and dealers.

Id. at 415. SIPA created SIPC, a non-profit corporation composed of registered brokers and dealers, to administer SIPA. 15 U.S.C. § 78ccc. Most securities brokers must be members of SIPC and must contribute to the fund SIPC maintains for investor protection. See id. § 78ddd. Not unlike the Federal Deposit Insurance Corporation (FDIC), SIPC insures investors who deposit cash or securities with a broker against the risk of broker insolvency. Pursuant to SIPA, SIPC oversees the liquidation of brokers and dealers. See id. § 78eee. In a liquidation proceeding, the SIPC fund is available if the debtor's general estate is insufficient to pay customer claims. See id. § 78fff-3(a).

SIPA precisely delineates the category of investors entitled to protection under the Act. Specifically, only a "customer" of a registered broker-dealer is protected. SIPA defines the term "customer" as:

> any person . . . who has a claim on account of securities received, acquired, or held by the debtor in the ordinary course of its business as a broker or dealer from or for the securities accounts of such person for safekeeping, with a view

7

to sale, to cover consummated sales, pursuant to purchases, as collateral security, or for purposes of effecting transfer. The term "customer" includes any person who has a claim against the debtor arising out of sales or conversions of such securities, and <u>any person who has deposited cash with the debtor for the purpose of purchasing securities</u>. . . .

15 U.S.C. § 78lll(2) (emphasis added).

An investor is entitled to protection under SIPA, and compensation from SIPC, only if the investor entrusted cash or securities with the now insolvent broker-dealer. <u>Securities Investor Protection Corp. v. Pepperdine University (In re Brentwood Sec., Inc.)</u>, 925 F.2d 325, 327 (9th Cir. 1991). In addition, to qualify as a customer, an investor must demonstrate cash deposited with the debtor was deposited "for the purpose of purchasing securities." 15 U.S.C. § 78lll(2). SIPA also expressly defines the term "security:"

> The term "security" means any note, stock, treasury stock, bond, debenture, evidence of indebtedness, any collateral trust certificate, preorganization certificate or subscription, transferable share, voting trust certificate, certificate of deposit, certificate of deposit for a security, or any security future as that term is defined in section 78c(a)(55)(A) of this title, any investment contract or certificate of interest or participation in any profit-sharing agreement or in any oil, gas, or mineral royalty or lease (if such investment contract or interest is the subject of a registration statement with the Commission pursuant to the provisions of the Securities Act of 1933 [15 U.S.C.A. § 77a et seq.] ), any put, call, straddle, option, or privilege on any security, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase or sell any of the foregoing, and any other instrument commonly known as a security. Except as specifically provided above, the term "security" does not include any currency, or any commodity or related contract or futures contract, or any warrant or right to

subscribe to or purchase or sell any of the foregoing.

15 U.S.C. § 78lll(14). Claimants seeking "customer" status under SIPA bear the burden of proving they fit within the statutory definition. Securities Investor Corp. v. Wise (In re Stalvey & Assocs.), 750 F.2d 464, 472 (5th Cir. 1985); Mitchell v. Chicago Partnership Board, Inc., 246 B.R. 854, 855 (N.D.Ill. 2000).

B.

A claimant is a "customer" protected by SIPA only to the extent the claimant deposited cash or securities "with the debtor." 15 U.S.C. § 78lll(2). The Trustee and SIPC assert because Claimants' checks were not made out to Primeline or to Primeline's clearing broker, and because Primeline did not actually receive the funds, Claimants' funds were not deposited "with" Primeline. Whether a claimant deposited funds "with the debtor" does not depend simply on to whom claimants made their checks payable. See In re Old Naples, 223 F.3d at 1302. The relevant inquiry is whether the brokerage firm actually received, acquired or possessed Claimants' property. Id.

Where a claimant deposited funds with a broker, the question becomes whether the claimant intended to invest through the broker in his individual capacity or in his capacity as an agent of the brokerage. "Claimants who invest with a broker in his individual capacity are not protected by SIPA." Id. at 1303 (citations omitted). Similarly, claimants who invest directly in a third-party company are not protected by SIPA, even if their broker suggested the investment. Id. SIPA does, however, protect claimants who attempt

9

to invest through their brokerage firm but are defrauded by dishonest brokers. Id. If a claimant intended to have the brokerage purchase securities on the claimant's behalf and reasonably followed the broker's instructions regarding payment, the claimant is a "customer" under SIPA even if the brokerage or its agents misappropriate the funds. Id.; see also In re Brentwood, 925 F.2d at 329-30.

In this case, the bankruptcy court found: "Claimants reasonably thought Ameen was acting as an agent of Primeline when he directed them to make out their checks to one of his third-party companies." We cannot say this finding was clearly erroneous. As the court noted, most of the Claimants met with Ameen at the Primeline offices. Ameen provided potential investors a Primeline business card reflecting his position as a Primeline Registered Representative. Many of the Claimants completed Primeline New Account forms prior to entrusting their funds to Ameen. Each of the Claimants followed Ameen's instructions in delivering funds for investment. In some cases, Ameen delivered fraudulent statements on Primeline letterhead confirming the investment or reflecting the promised return. Ameen had both actual and apparent authority to enter into securities transactions as an agent of Primeline, and the bankruptcy court did not err in ruling Claimants deposited cash "with the debtor."

C.

To prevail, Claimants also must establish they deposited cash with the debtor "for the purpose of purchasing securities." 15 U.S.C. § 78lll(2). When a claimant entrusts

cash with a broker, and the broker misappropriates the funds, "courts must determine whether the intended investment, as understood by the claimant, would have been in a security as defined by SIPA." In re Old Naples, 223 F.3d at 1304. Claimants generally testified they did not understand the difference between various investment options and relied solely upon Ameen's expertise to select an appropriate investment vehicle. The bankruptcy court found most Claimants "were attempting to make [a] 'pooled investment' through Primeline rather than [attempting to] purchase stock in a specific corporation." The Trustee and SIPC assert because such Claimants are unable to point to specific investments they intended to make, they cannot meet their burden of proving they entrusted funds for "the purpose of purchasing securities."

When a claimant deposits funds with a brokerage for investment, SIPA provides protection even if the claimant does not identify specific securities for the broker to purchase. See id. at 1305 (claimants who wired funds with the intent to purchase "discount bonds of some sort" entitled to customer status under SIPA); Securities Investor Protection Corp. v. C.J. Wright & Co. (In re C.J. Wright & Co.), 162 B.R. 597, 608-09 (Bankr. M.D.Fla. 1993) (claimants who invested in debtor brokerage's "Money Market Club" and "Deposit Account," with the understanding that the funds would be used to purchase unnamed certificates of deposit, are entitled to customer status under SIPA). Although investors need not designate a specific security, investors must have some notion of the investment vehicle in which they wish their broker to invest. See In re Old

11

Naples, 223 F.3d at 1305 ("[A] deposit of funds with only the vaguest instructions to make 'stock market investments' would not qualify as a deposit 'for the purpose of purchasing securities.'"). Many potential investment vehicles fall outside the scope of SIPA's protections. To qualify as a "customer" under SIPA, Claimants must prove more than a general intent to invest. Claimants must demonstrate an intent to invest in an investment vehicle included in the SIPA definition of "security."[7]

SIPA's definition of "security" includes numerous investment vehicles. SIPA expressly protects investments in all traditional security interests. See id. at 1306. Investments in more flexible or unusual vehicles, however, are within the scope of the Act only to the extent such investments are registered with the Securities Exchange

---

[7] The SIPA definition of "security" was modeled after the definition of security found in the Securities Act of 1934, 15 U.S.C. § 78a et seq. The purpose of each Act, however, is significantly different. Congress' purpose in enacting the securities laws was "to regulate investments in whatever form they are made and by whatever name they are called." Reves v. Ernst & Young, 494 U.S. 54, 61 (1990). In contrast, SIPA provides much more limited protection to a specified category of investors. See In re Brentwood, 925 F.2d at 330; In re Stalvey, 750 F.2d at 472. SIPA expressly excludes from the definition of a "security" certain investment vehicles covered by the securities acts including unregistered investment contracts, profit-sharing agreements, and oil and gas interests. SIPA also excludes investments in "currency, or any commodity or related contract or futures contract, or any warrant or right to subscribe to or purchase or sell any of the foregoing" unless such interest is specifically included in the statute's itemized list. This limiting language does not appear in the securities acts. SIPA's legislative history indicates Congress intentionally narrowed SIPA's coverage. See, e.g., S.Rep. No. 763, 95th Cong. 2d Sess., reprinted in 1978 U.S.C.C.A.N. 764, 780. See also In re Stalvey, 750 F.2d at 472 (SIPA's definition of security must be narrowly construed). Claimants' citation to cases interpreting the securities acts are thus inapposite. The SIPA definition of "security" must be construed in accordance with that Act's purpose and scope.

12

Commission (SEC). See id. Before the district court, Claimants argued they intended to purchase an "investment contract." We agree the "pooled investment" Claimants describe is clearly an investment contract or profit-sharing agreement and not a traditional security interest. As the district court noted, such interests are not included within the statutory definition of security because they were not registered with the SEC.[8] Accordingly, we conclude Claimants' deposits for investment in Ameen's pooled investment opportunity are not deposits "for the purpose of purchasing securities." Claimants therefore are not entitled to customer status under SIPA with respect to such claims.

Several Claimants attempted to purchase debentures rather than participate in the pooled investment option. In exchange for their cash, these Claimants received fraudulent "Debenture Certificates." Debentures are specifically included in the SIPA statutory definition of "security." Although these Claimants clearly could have exercised more diligence in researching their investment, Ameen repeatedly assured the Claimants the investment was legitimate. In addition, as the bankruptcy court noted, language and cultural barriers prohibited many of the Claimants from questioning Ameen's investment advice. To the extent Claimants sought to purchase debentures, Claimants deposited funds "for the purpose of purchasing securities." Claimants are entitled to customer

---

[8] An "investment contract or certificate of interest or participation in any profit sharing agreement" falls within the SIPA definition of security only "if such investment contract or interest is the subject of a registration statement with the Commission pursuant to the provisions of the Securities Act of 1933." 15 U.S.C. § 78lll(14).

13

status under SIPA with respect to such claims.

III.

In addition to the grounds on which the district court relied, the Trustee and SIPC argue Claimants are not "customers" under SIPA because Claimants did not effect their transactions "in the ordinary course of Primeline's business" as required under the Act. The definition of "customer" under SIPA is limited to any person "who has a claim on account of securities received, acquired, or held by the debtor <u>in the ordinary course of its business as a broker or dealer</u> . . . ." 15 U.S.C. § 78lll(2) (emphasis added). Claims for "cash deposited with the debtor for the purpose of purchasing securities" are subject to the same requirement.[9] The Trustee and SIPC rely primarily on the unusually high rate of return offered though the pooled investment option to argue Claimants' transactions were not in the ordinary course of Primeline's business. Claimants are not entitled to customer

---

[9] Although this section of the SIPA customer definition does not expressly include the ordinary course of business requirement, a plain reading of the definition suggests the "ordinary course of business" requirement applies to cash deposits as well as to deposits of securities. The statute expressly states that protection for security transactions is limited to transactions conducted in the ordinary course of business. 15 U.S.C. § 78lll(2). Cash deposited "for the purpose of purchasing securities" necessarily includes a similar requirement. SIPA treats identically claims for cash and claims for securities in calculating a customer's net equity. The customer definition cannot reasonably be read to expand SIPA protection for cash deposits by eliminating the "ordinary course of business" requirement. Cf. In re Old Naples, 223 F.3d at 1306 (noting the statutory language does not necessarily require investors asserting claims for cash to show funds were entrusted in the ordinary course of business, but concluding that such a requirement would be "superfluous" as deposits of cash must be for the purchase of "traditional security instruments" and must involve "transactions with indicia of a fiduciary relationship" which necessarily restricts SIPA protection to "claimants who sought legitimate brokerage services.").

14

status with respect to funds invested in the pooled investment option. The fraudulent "debentures" provided a more modest rate of return, between twelve and fifteen percent per annum. Debentures also are a traditional security interest investors could reasonably expect to purchase through a brokerage firm. The debenture transactions are not so extraordinary as to be outside Primeline's "ordinary course of business."

Citing the fixed rate of return, the Trustee and SIPC also assert Claimants were lenders rather than investors. SIPA excludes from the definition of "customer" individuals whose claims are for "cash or securities which by contract, agreement, or understanding, or by operation of law, is part of the capital of the debtor." 15 U.S.C. § 78lll(2)(B). Individuals must have a fiduciary relationship, rather than a creditor-debtor relationship with their brokerage firm to qualify as a "customer" under SIPA. See In re Old Naples, 223 F.3d at 1304. There is no evidence in the record, however, to suggest Claimants intended to loan to Ameen or to Primeline the funds at issue. Bonds, debentures and other debt instruments frequently pay a fixed rate of return. The bankruptcy court found Claimants intended to invest, not loan, the funds each entrusted to Ameen. This finding is fully supported by the record.[10]

We AFFIRM the district court order denying Claimants SIPA customer status with

---

[10] The Trustee and SIPC also assert five claimants, Saeed Mansouri, Mohammad H. Miah, Muhammad Farooq Mian, Muhammad Sharifur Ranhman and Mohammad Hasibur Rahim, failed to offer sufficient documentation of alleged cash transactions with Ameen. We need not address this issue. Each of these claimants sought to participate in the pooled investment scheme and thus are not entitled to customer status under SIPA.

respect to funds Claimants sought to invest in the pooled investment scheme or other unidentified investment vehicle. Claimants Faruk Ahammed, Saeed Cheema, Mohammed Saiful Islam, Rabiul Karim, Saeed Mansouri, Mohammad H. Miah, Muhammed Farooq Mian, Mohammad Hasibur Rahim, Muhammad Sharifur Rahman, and Shahid Uzzaman are not customers under SIPA. We REVERSE the district court order denying SIPA customer status to Claimants Geeta Choski, Mahendra A. Rathi and Subhash Shah with respect to funds each Claimant sought to invest in debentures. With respect to such funds, these Claimants are customers under SIPA and entitled to SIPC protection in the Primeline liquidation proceeding. We REMAND for proceedings consistent with this opinion.